**John P. HEANEY, M.D.,**
**Plaintiff-Appellant,**

v.

**UNITED STATES VETERANS ADMINISTRATION, et al.,**
**Defendants-Appellees.**

No. 84–1348.

United States Court of Appeals,
Fifth Circuit.

April 11, 1985.

Larry Watts, Watts & Co. Lawyers, P.C., Robert B. Watts, Bracewell & Patterson, Kelly Frels, Lisa G. Gerling, Houston, Tex., Charles Alan Wright, Austin, Tex., for plaintiff-appellant.

Edward C. Prado, U.S. Atty., San Antonio, Tex., Pamela Mathy, Washington, D.C., for defendants-appellees.

Before CLARK, Chief Judge, GARWOOD and JOLLY, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

This case is an appeal from a grant of the defendants' Motion to Dismiss or in the Alternative Motion for Summary Judgment. The plaintiff-appellant Heaney, a doctor employed by the Veterans Administration, sought damages, arising from withdrawal of his surgical privileges, for violation of his first and fifth amendment rights

under the authority of *Bivens v. Six Unknown Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), and its progeny. Heaney requested redress in the amount of several million dollars for damages including, but not limited to, emotional distress, mental anguish and injury to his reputation, and also requested punitive damages predicated on the defendants' alleged reckless, callous and evil acts, which he maintained violated his constitutional rights. Because we find Heaney had access to a measure of administrative relief under Veterans Administrations' regulations, we hold that his damage action is precluded, and accordingly affirm the district court's dismissal for failure to state a claim upon which relief may be granted.

## I

The district court styled its action as a dismissal under Fed.R.Civ.P. 12(b)(6); accordingly, we also treat the ruling as a response to a motion to dismiss under Fed. R.Civ.P. 12(b)(6). In reviewing such a dismissal, we may not go outside the pleadings. We accept all well pleaded facts as true and view them in the light most favorable to the plaintiff. We cannot uphold the dismissal "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80, 84 (1957); *Cook & Nichol, Inc. v. Plimsoll Club*, 451 F.2d 505, 506 (5th Cir.1971).

## II

Heaney joined the Kerrville Veterans Administration Medical Center (KVAMC), where he had previously served as a consultant, in June 1980. Soon after Heaney became a full-time VA surgeon, he became embroiled in disputes with Y.C. Smith, then Chief of Staff, and Joshua Seidel, then Chief of Surgery. Heaney asserts that these disputes arose because of his suggestions that the KVAMC procedures were not as good as they should have been and that numerous improvements could be made,

and that the defendants resented his observations.

Heaney's tenure at the KVAMC is marked by a constantly escalating series of confrontations between Heaney and other members of the medical staff. These activities culminated in the convening of a local Professional Standards Board which met in October, November and December of 1981 to evaluate Heaney. Among the materials considered by the Board was a tabulation purporting to show the number of patients undergoing major surgery performed by Heaney during a one-year period, and the disposition of those patients in terms of death, infection, or transfer; the tabulation reflected poorly on Heaney. Heaney asserts that this tabulation was fraudulently compiled by members of the hospital staff as part of a conspiracy to oust him unjustly from the KVAMC.

The Board was reconvened on January 4, 1982, to consider whether Heaney should be transferred from surgery to another service. The Board recommended that Heaney's surgical privileges be withdrawn. As recommended by the Board, Heaney's assignment was changed to that of staff physician in the Rehabilitation Medical Service, and the matter was forwarded for further action to the VA Central Office Screening Committee. Heaney maintains the Board's activities were misrepresented to him by the defendants.

Heaney's surgical records were reviewed by two physicians appointed by the VA Central Office. Heaney maintains that this review finally resulted in a finding that he was completely competent and fully capable of performing and discharging his duties as a staff surgeon at the KVAMC. Despite this report, Heaney was not reinstated until nearly seven months after the review, and then only after he had personally appealed to the Chief Medical Director in Washington and demanded a review of his performance by his professional peers. The surgeons subsequently reviewing the data have privately conceded that there was no support whatsoever for the conclusions presented in the "audit" or in any of

the material sent to the VA Central Office by the Board, Heaney says.

Heaney alleges the first Professional Standards Board was unduly biased against him and contained members of the staff who were involved in the conspiracy to oust him from the KVAMC. Heaney states that he was read, not given, a list of the charges against him. He also says that he was told that he must request in writing a copy of the charges, and was given twenty-four hours to respond. Heaney further asserts that key documents, including the contested tabulations, were never provided or disclosed to him. Heaney asserts that the Board and the KVAMC secretly recommended his dismissal to higher officials in Washington, and intentionally withheld from him all key supporting material which accompanied that recommendation. Heaney asserts that his reputation was damaged by the circumstances of the initial audit and report.

Heaney alleges that the defendants denied him due process and violated his first amendment rights, and that his administrative relief was inadequate to compensate him for the damage done to his reputation and to his emotional state. Accordingly, Heaney sought to bring suit for declaratory relief and damages directly under the United States Constitution under the authority of *Bivens v. Six Unknown Agents.* The district court dismissed his claim for failure to state a claim upon which relief may be granted under the authority of *Carroll v. United States,* 721 F.2d 155 (5th Cir.1983), holding that a measure of administrative remedies was available to Heaney and that his damages action was accordingly precluded. On appeal, Heaney raises only the issue of whether the district court erred in holding that his damages action is barred under *Bush v. Lucas,* 462 U.S. 367, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983). For the reasons discussed below, we affirm the district court's holding.

### III

Unlike many federal employees, Heaney and other medical personnel at the Veterans Administration hospitals are not subject to the terms of the Civil Service Reform Act (CSRA), which provides an elaborate civil service review mechanism for disputes arising under the employment relationship. Rather, Heaney is subject to the internal disciplinary rules of the Department of Medicine and Surgery (DMS), which were specifically designed to offer less protection than the CSRA.

In passing the legislation which established the VA's hospitals and health-care facilities, Congress was well aware of the special nature of professionals—physicians, dentists, and surgeons. Title 38 of the United States Code, which deals with the VA, is replete with examples of special treatment for professionals in the DMS. Their pay scales are different, 38 U.S.C. § 4118 (Supp.V.1976); their appointments are more discretionary, 38 U.S.C. § 4104 (Supp.V.1976); and they are exempted from other civil service requirements for qualifications. *Orloff v. Cleland,* 708 F.2d 372 (9th Cir.1983). In addition, administrators are allowed more discretion in disciplining and discharging employees under the DMS regulations than is allowed to administrators under the CSRA.

Pursuant to 38 U.S.C. § 4110, the VA has established a three-stage disciplinary process for the investigation, presentment, and determination of charges involving an employee's alleged "inaptitude, inefficiency, neglect or unwillingness to comply with instructions, established policies, procedures, rules and regulations, and with commonly accepted standards of personal conduct." These regulations are set out in the VA personnel manual.

The first stage of the VA disciplinary process is a local "preliminary inquiry." In cases involving VA surgeons such as Heaney, the preliminary inquiry is conducted by a professional standards board. During this initial stage, employees enjoy few procedural rights.

If, based upon the findings of the professional standards board, the VA station head requests "the removal, demotion or suspension" of an employee, the matter is

referred to the Office of the Chief Medical Director of the VA in Washington where it is evaluated by the Central Office Screening Committee. At this second stage the employee also has few procedural rights.

If the Central Office Screening Committee recommends that charges be presented, a letter of charges is issued, commencing formal disciplinary board proceedings during which the employee enjoys a greater range of procedural rights. The letter of charges notifies the employee of the proposed action, the alleged grounds therefor, and the procedural rights available during disciplinary proceedings. The employee may respond to charges in writing or may request a full hearing. The presiding officer of the disciplinary board is required by regulation to conduct the hearings in an impartial and fair manner and must afford both sides the opportunity to properly present and support their respective positions. The employee has a right to an attorney at this hearing, a right to question adverse witnesses, and a right to call witnesses in his own behalf.

■ The employee may appeal the decision of this board to the Administrator of the Veterans Administration if the disciplinary action to be imposed is more severe than an admonishment. The VA Administrator's determination of an appeal is a final agency decision. Appeal to federal court is provided by statute under 5 U.S.C. §§ 702, 706, where the decision may be reversed if the employee has not been afforded procedural due process as provided by statute, regulation and the Constitution, or where the decision was arbitrary or capricious. *Moore v. Custis*, 736 F.2d 1260 (8th Cir.1984); *Gilbert v. Johnson*, 601 F.2d 761 (5th Cir.1979).

It is clear that Congress intended that DMS personnel should be subject to a less protective grievance system than is available to ordinary civil service employees.

Congress "wanted to give the Administration authority to employ or discharge without the usual time consuming and detailed service procedures." *Orloff v. Cleland*, 708 F.2d 372 (9th Cir.1983). The structure of the scheme, reviewed in part above, is designed to allow the DMS to discipline unsatisfactory or disqualified employees holding positions such as Heaney's without the restrictions pertaining to the civil service.[1] Accordingly, we must recognize that to allow a nonstatutory damage remedy here would have some effect tending to upset the balance between the interests of maintaining quality medical personnel and the protection of constitutional rights struck by Congress in creating the DMS.

## IV

■ At the outset we assume that Heaney's constitutional rights have been violated and that Congress and the Veteran's Administration have provided a less than complete remedy for the wrong. We also assume the facts alleged in Heaney's complaint. The issue is thus whether the relief available under the DMS regulatory scheme precludes the creation of a new nonstatutory damages remedy; we conclude that the DMS regulatory scheme does preclude a damages remedy. Accordingly, because no relief may be granted under Heaney's complaint, we affirm its dismissal for failure to state a claim upon which relief may be granted.[2]

■ The federal courts have power to grant relief, including damages, for violations of constitutional rights under the general statutory grant of authority to decide all cases "aris[ing] under the Constitution, laws or treaties of the United States." 28 U.S.C. § 1331, *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). How-

---

**1.** The legislative history is to the same effect. *See generally:* S.Rep. No. 858, 79th Cong., 1st Sess. 956 (1945).

**2.** We note that injury to reputation is not actionable under the fifth amendment. *Paul v. Davis,*

424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). However, because we decide this case on other grounds, it is not necessary to dispose of this issue separately.

ever, Congress may expressly or impliedly withhold a remedy:

> Bivens established that the victims of a constitutional violation by a federal agent have a right to recover damages against the official in federal court despite the absence of any statute conferring such a right. Such a cause of action may be defeated in a particular case, however, in two situations. The first is when defendants demonstrate "special factors counseling hesitation in the absence of affirmative action by Congress." 403 U.S., at 396 [91 S.Ct. at 2004]; Davis v. Passman, 442 U.S. 228, 245 [99 S.Ct. 2264, 2277, 60 L.Ed.2d 846] (1979). The second is when defendants show that Congress has provided an alternative remedy which it explicitly declared to be a substitute for recovery directly under the Constitution and viewed as equally effective. Bivens, supra, at 397 [91 S.Ct. at 2005]; Davis v. Passman, 442 U.S., at 245–247 [99 S.Ct. at 2277–2278].

Carlson v. Green, 446 U.S. 14, 18–19, 100 S.Ct. 1468, 1471, 64 L.Ed.2d 15 (1980).

Because Congress has not expressly removed the statutory jurisdiction of the federal courts to award damages in cases covered by DMS regulations, the question before us is whether the regulatory scheme constitutes a special factor counseling hesitation in authorizing such a remedy. For the reasons discussed below, we hold that the enactment of the DMS scheme presents a special factor counseling hesitation; accordingly, no private damage action may be allowed in this case.

■ Where a coordinate branch of the government has provided a government employee with a procedure under which a constitutional claim arising out of the employment relationship is cognizable and some measure of relief may be obtained, a nonstatutory damage action is not available for discharge, demotion or other adverse personnel actions absent clear evidence of an intent by the coordinate branch not to foreclose the nonstatutory damage remedy.

Bush v. Lucas, 462 U.S. 367, 103 S.Ct. 2404, 2415, 76 L.Ed.2d 648 (1983); Carroll v. United States, 721 F.2d 155 (5th Cir. 1983). In Bush the Court held that the existence of a meaningful alternative remedy provided by Congress was a "special factor" counselling hesitation; the Court's rationale was that Congress, not the judiciary, should make the policy decisions inherent in creating remedies for federal employees, thus distinguishing claims arising out of the employment relationship from prior cases which had permitted a damages remedy.

The Court noted that in its prior cases in which a damages action had been allowed, "the Government had not advanced any substantial policy consideration against recognizing a federal cause of action for violation of ... [personal constitutional] rights by federal officers." Bush 103 S.Ct. at 2410. However, Bush found that the special nature of the government employment relationship and the need to operate government facilities efficiently, provide substantial policy considerations warranting the preclusion of a nonstatutory damage remedy where a coordinate branch has moved to provide a measure of relief through a mechanism in which constitutional claims arising from the employment relationship are cognizable. Bush at 2417. It is not for the courts to decide whether it would be good policy to permit a government employee to recover damages; rather, the central issue is whether decision makers who are in a better position than is the judiciary to decide whether the public interest would be served by a proposed remedy, have created a scheme with which the remedy would interfere. Id.

The Court has repeatedly stressed the central issue of the intent of the coordinate branches in Bush and its antecedents. Carlson concerned an alleged violation of the plaintiff's eighth amendment rights for which he could have sought redress under the Federal Tort Claims Act, although that Act was conceded to make available less than complete relief. The Court permitted a damage action there despite the existence

of the alternate remedy because the intent of Congress as manifested in the legislative history of the FTCA "made it crystal clear that Congress views FTCA and *Bivens* as parallel, complementary causes of action." *Bush* at 241 (quoting *Carlson* 100 S.Ct. at 1471–72). Thus, it is clear that *Bush* viewed *Carlson* as turning on the issue of congressional intent, not the Court's independent assessment of the need for a damages remedy.

*Davis v. Passman,* 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979), focusing on the lack of any alternative remedy, permitted a congressional assistant to maintain a damage action directly under the fifth amendment for alleged sexual discrimination against her former employer. The Court stressed the complete absence of other redress: "[S]ince respondent is no longer a Congressman ... equitable relief in the form of reinstatement would be unavailing. And there are available no other alternative forms of judicial relief. For Davis, as for Bivens, 'it is damages or nothing.'" 99 S.Ct. at 2277. Thus, *Davis* is consistent with the proposition that where a coordinate branch of the government has constructed a remedial mechanism that allows an aggrieved employee to present a constitutional claim to obtain a measure of relief, a damages action is precluded absent clear congressional intent to the contrary.

Heaney asserts that *Bush* is inapposite to the present case because *Bush* held that a damages claim is precluded only where the alternative remedy available is meaningful; Heaney asserts the limited relief available under the DMS—in his case limited to reinstatement—is not meaningful redress for the violation of his first and fifth amendment rights. However, the remedy here certainly cannot be considered as meaningless as Heaney maintains; the above-quoted passage from *Davis* suggests that a scheme which provides for reinstatement offers an adequate measure of relief. This is entirely consistent with the often restricted availability of damages as op-

posed to equitable relief against governmental bodies under federal law. *See Bush* 103 S.Ct. at 2409 n. 12 (collecting cites). In the present case, DMS regulations provide for reinstatement and other relief where an adverse personnel decision is found to be unconstitutional. Thus, the DMS system provides a measure of relief. This is enough to preclude a damages remedy.

Our holding here is also supported by the precedent of this court. In *Carroll v. United States,* 721 F.2d 155 (5th Cir.1983), the plaintiff alleged she was not rehired to her former government job because of her union activism. The *Carroll* plaintiff was entitled to some administrative relief under Executive Order 11491, a predecessor of the Civil Service Reform Act (CSRA), which provided procedures less elaborate than those of the CSRA. We affirmed the dismissal of her claim for redress under the first amendment on the simple grounds that "[a] measure of administrative remedies was available and was exercised." *Carroll* at 156. *Broussard v. United States Postal Service,* 674 F.2d 1103 (5th Cir.1982), concerned a postal employee who sued the Service and named individuals for his allegedly unconstitutional termination. This court affirmed the dismissal of his suit: "[T]he inference of a *Bivens*-type remedy would undermine the government's control over its internal personnel affairs, encourage aggrieved employees to bypass statutory and administrative remedies, and provide a disincentive for Congress to improve administrative mechanisms." *Broussard* at 1112. Again, in *Broadway v. Block,* 694 F.2d 979 (5th Cir.1982), we denied the availability of a damage remedy under the Constitution to a Farmers Home Administration employee on the ground that the remedy would disturb the balance reached by the Congress and the Administration in the available employee grievance procedure. Finally, *Gremillion v. Chivatero,* 749 F.2d 276 (5th Cir.1985) and *Williams v. Collins,* 728 F.2d 721 (5th Cir.

1984), also denied the availability of a damage action where alternative remedies were available.[3]

## V

Heaney seeks to avoid *Bush* preclusion by characterizing his difficulties as not involving "personnel actions"; we do not agree. The scope of what constitutes a "personnel action" for purposes of *Bush* -preclusion analysis is best determined by what *Bush* saw as the government's legitimate interest in setting "federal personnel policy"; for it is this strong government interest in determining "federal personnel policy" that justifies the judicial deference to the coordinate branches in the *Bush* analysis:

> [I]t is quite probable that if management personnel face the added risk of personal liability ... that they would be deterred from imposing discipline in future cases.... Congress is in a far better position than a court to evaluate the impact of a new species of litigation between federal employees on the efficiency of the civil service.

*Bush* 103 S.Ct. at 2417.

 Heaney is entitled to no more relief than is afforded him by his statutory and administrative remedies. There is little doubt that many employees could cast their grievances in the form of allegations of conspiracies, frauds and misrepresentations, just as Heaney has done here. It is possible, were we to permit his damages claim, that DMS officials might be deterred from imposing discipline in the future. Whether this assessment is accurate, the possibility itself is enough to place the matter here into the category of "federal personnel policy". *Id.* Heaney draws atten-

tion to *Bush*'s observation that "wiretappings, warrantless searches, or uncompensated takings, would not be defined as 'personnel actions' within the statutory scheme" of the CSRA. *Bush* at 2415 n. 28. But Heaney admits that his grievances *were* cognizable in the DMS system; his contention is that complete relief was not afforded. Heaney alleges that he was deprived of the benefit of his rights under DMS regulations by the defendants' concealments and misrepresentations during the course of the disciplinary proceedings; however, had the VA persisted in its efforts to discharge Heaney, or if it attempts to discharge him in the future on the basis of these allegedly irregular proceedings, Heaney would have access to the DMS system of appeals described above. The procedures under the DMS system are not as elaborate as the procedures available under the CSRA, but they do not deny a measure of relief to someone in Heaney's position; by his reinstatement, Heaney admits, as he must, that he achieved a measure of relief for the alleged constitutional injury he suffered, and that as a result of his efforts with the VA his status was restored. Accordingly, the district court was correct in dismissing for failure to state a claim upon which relief may be granted.

AFFIRMED.

---

**3.** Heaney contends that *Bush* is inapposite here because the procedural safeguards available under the DMS regulations are less elaborate than those of the CSRA. Heaney draws attention to *Bush*'s detailed examination of the CSRA. However, we believe that *Bush*'s review of the history and details of the CSRA is best read to point out that Congress is capable of constructing an appropriate system of employee redress, more capable than are the courts. *Bush* at 2417. Moreover, *Bush* expressly pointed out

that the history of the CSRA removes any reason to discount Congress's ability to make an even-handed assessment of the desirability of a new remedy. *Id.* Congress has chosen to exercise its special expertise and prerogative by providing a less protective system for Veterans Administration medical personnel than for ordinary civil servants, and that is precisely the kind of decision that *Bush* acknowledges the legislature is in the better position to make than are the courts.