Kathy M. SHELTON–RIEK, Plaintiff,

v.

B.W. STORY, David S. Katzin, Joseph B. Sutter, Cynthia Spry, Jo E. Cooley, Keith D. Ruether, Robert Hackett, Sharon Machovina, Ed Sessoms, Maria Hall and Tanya B. Burton, Defendants.

No. 1:98CV00543.

United States District Court, M.D. North Carolina.

Nov. 19, 1999.

Nancy R. Gaines, Salisbury, NC, for plaintiff.

Gill P. Beck, Office of U.S. Atty, Greensboro, NC, for defendants.

## MEMORANDUM OPINION

BEATY, District Judge.

This matter is before the Court on Defendants B.W. Story, David S. Katzin, Joseph B. Sutter, Cynthia Spry, Jo E. Cooley, Keith D. Ruether, Robert Hackett, Sharon Machovina, Ed Sessoms, Maria Hall, and Tanya B. Burton's Motion to Dismiss or in the Alternative for Summary Judgment [Document # 7]. For the reasons stated herein, Defendants' Motion for Summary Judgment is granted.

## I. FACTS

In 1991, the Salisbury Veterans Administration Medical Center (the "VA") hired Kathy Shelton–Riek ("Plaintiff" or "Shelton–Riek"), a licensed social worker. (Compl.¶ 11.) In November, 1995, Shelton–Riek accepted the position of coordinator of the Specialized Inpatient PTSD (Post Traumatic Stress Disorder) Unit ("SIPU") at the VA. (Compl.¶ 15.)

Before and during Shelton–Riek's time as coordinator, the SIPU suffered from administrative difficulties. (Compl.¶ 22.) Those difficulties continued through September, 1996, when the VA enlisted the aid of an outside consultant to conduct a site evaluation of the SIPU. The consultant made several recommendations for reengineering the SIPU, including that the VA apply for funding for a temporary coordinator of the SIPU and that the VA conduct a national search for an SIPU coordinator. (Pl.Ex. J at 8.)

On December 10, 1996, Dr. David Katzin, then acting Chief of Staff of the VA, requested that Shelton–Riek resign her position as coordinator of the SIPU. (Compl.¶ 39.) On December 19, 1996, before Shelton–Riek officially responded to Dr. Katzin's request, he announced her resignation. (Compl.¶ 42.) On December 23, Shelton–Riek informed Dr. Katzin that she refused to resign. (Compl.¶ 42.)

Following Dr. Katzin's announcement of Shelton–Riek's resignation, VA staff, including Staff Nurse Robert Hackett, Nurse Manager Cynthia Spry, Nurse Sharon Machovina, and Dr. Jo E. Cooley, a clinical psychologist at the VA, reported that some VA patients had indicated that Shelton–Riek had revealed to them that the SIPU was to be closed. It was also disclosed that Shelton–Riek had informed the patients that staff members, including Nurse Hackett, Dr. Cooley, and Psychology Technician Keith Ruether, were working to close the SIPU and oust Shelton–Riek. The patients also stated that Shelton–Riek had urged patients to work to keep the SIPU open and prevent Shelton–Riek's removal. (Def.Ex. F ¶¶ 4, 5, I ¶¶ 4, 5, H ¶ 6.) These incidents occurred on December 20, 21, 22, and 24, 1996. The staff members to whom the patients spoke made official reports of their conversations pursuant to VA Medical Center Memorandum 05–5 which requires VA staff to report any "abuse or mistreatment" of a patient to the proper authority. (Def.Exs. F ¶ 5, G ¶ 12, I ¶ 6.) Four VA staff members, Dr. Cooley, Nurse Machovina, Nurse Hackett, and Psychology Technician Ruether reported that they were concerned for their safety as a result of Shelton–Riek's discussions with patients. (Def.Exs. G ¶ 17, H ¶¶ 7, 8, I ¶ 9, J ¶ 16.) Shelton–Riek denies discussing with patients the closure of the SIPU or having inappropriate patient contact. (Pl.Exs. Q ¶ 7, AA ¶ 11, CC ¶ 6.)

On December 30, 1996, Dr. Katzin detailed Shelton–Riek to a position in Social Work Service. In a memo, he told her that she was the subject of an administrative investigation and that she was to have no further contact with patients or SIPU staff. (Compl.¶ 44.) The investigation concerned Shelton–Riek's reported conversations with patients regarding the closing of the SIPU. (Pl.Ex.A.) Shelton–Riek testified in her own defense in the VA investigation on January 21, 1997. (Compl.¶ 62, Pl.Ex.A.)

As the VA was conducting its investigation of Shelton–Riek, during the week of January 6, 1997, Dr. Cooley filed a complaint with the North Carolina Board for Social Work ("the State Board") stating that Shelton–Riek had possibly violated her ethical obligations as a social worker. (Def.Ex. G ¶ 32.) Shelton–Riek contends that by filing the complaint with the State Board, Dr. Cooley bypassed VA procedures which required that complaints such as those raised against Shelton–Riek be handled internally rather than reported to professional licensing boards. (Compl.¶ 59.) Dr. Cooley's complaint to the State Board recounted reports that Shelton–Riek had discussed with patients the closure of the SIPU, advised the patients that Dr. Cooley, Nurse Hackett, and Psychology Technician Ruether, among others, were responsible for the closure of the SIPU, and urged the patients to take action to prevent the closure of the SIPU. (Def.Ex.G–6.) The complaint further stated that Dr. Cooley believed that Shelton–Riek's conduct violated the State Board's ethical principles "in that she used her status ... to engage clients in activities that were wholly self-serving" and "abused her power as SIPU Coordinator in such a way as to put colleagues ... in potential danger." (*Id.*) Dr. Cooley indicated that Psychology Technician Ruether, Nurse Hackett, and Nurse Machovina were witnesses to the events of which she complained. (Compl.¶ 58.)

As a licensed social worker, Shelton–Riek had an ethical obligation to report the State Board's investigation to potential clients. (Compl.¶ 61.) As a result, she lost business at a private counseling service she operated. In particular, Shelton–Riek has alleged that the investigation "had an impact on her ability to apply for Preferred Provider Status with many HMOs and Insurance Providers," and that she lost many current and potential clients and "more than one lucrative business contract with mental health care professionals." (Pl.Ex. RR ¶¶ 7–9.) Shelton–Riek also contends that the investigation "foreclosed" her opportunity to renew her counseling license in Louisiana. (*Id.* ¶ 10.) Even though the investigation reduced Shelton–Riek's counseling business, she is still a counselor, now working at the Family Therapy Institute, Ltd., of which she is the president. (*Id.* ¶ 1.) There is no evidence that the investigation had a continuing impact on Shelton–Riek's counseling practice.

During the investigation by the State Board, Shelton–Riek and the State Board investigator asked Dr. B.W. Story, Director of the VA, to release information from the VA investigation to the State Board so that it could conclude its investigation more quickly. (Compl.¶ 66.) However, Dr. Story "through her counsel Edison Sessoms and Tanya Burton" did not provide information and did not cooperate in resolving the State Board's investigation. (*Id.* ¶ 67.)

The State Board sent a notice to Dr. Cooley on July 30, 1997, indicating that it had closed the investigation of Shelton–Riek's behavior. (Pl.Ex.QQ.) The notice stated that the investigation did not "produce evidence to substantiate willful violations by Ms. Shelton–Riek" but that "[r]ealizing that insufficient evidence does not mean that some errors in judgment may not have occurred, the State Board has expressed cautions and made recommendations to Ms. Shelton–Riek about client and/or program advocacy." (*Id.*) The State Board took no further disciplinary action. (*Id.*)

On February 18, 1997, before the State Board completed its investigation of Shelton–Riek, Dr. Story sent Shelton–Riek a memo informing her that the VA's internal administrative investigation was over and that she was reinstated to her position as coordinator of the SIPU effective February 23, 1997. (Pl.Ex.SS.) On February 21, 1997, Shelton–Riek's physician noted that Shelton–Riek experienced a deep depression associated with the VA work environment and recommended that she be placed on medical leave. (Pl.Ex. JJ.) Shelton–Riek eventually accepted disability retire-

ment from the VA. (Compl.¶ 81.) Shelton–Riek alleges that the reports of improper patient contact, the detail to Social Work Services, the administrative investigation, the filing of the complaint with the State Board, and the refusal of the VA to assist in resolving the State Board's investigation were all part of a scheme to force her to resign as SIPU coordinator.[1]

On June 13, 1997, Shelton–Riek filed an action in North Carolina state court against Dr. Cooley, Nurse Hackett, Psychology Technician Ruether, and Nurse Machovina, alleging, among other things, that Defendants slandered Shelton–Riek.[2] The Assistant United States Attorney removed the action to this Court and filed certifications of scope of employment on behalf of Defendants. The United States Attorney also deemed the action an action against the United States and substituted the United States as the party defendant. Ultimately, this Court dismissed that action without prejudice because of Shelton–Riek's failure to comply with the Federal Tort Claims Act which requires that a party who brings a tort claim against the United States must exhaust his or her remedies with the appropriate federal agency before bringing suit in federal court.

In the case now before the Court, Shelton–Riek seeks to recover for deprivation of her constitutional right to due process. She claims that the actions of the Defendants created a work environment that caused her physical disabilities and emotional distress and ultimately forced her to take disability retirement, depriving her of her property interest in her employment without due process. She alleges a second constitutional violation in that Defendants deprived her of her constitutionally protected liberty interest in her reputation by filing a false complaint with the State Board which forced her to reveal the investigation to her clients and ultimately caused her to lose clients in her private counseling business. The Court will address these claims in turn.

## II. DISCUSSION

### A. STANDARD OF REVIEW

This case is before the Court on Defendants' Motion to Dismiss or in the Alternative for Summary Judgment [Document # 7]. Because the Court elects to consider items outside the pleadings, it will treat Defendants' motion as a Motion for Summary Judgment under Rule 56. *See* Fed. R.Civ.Proc. 12(b) ("If on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment....")

Generally, summary judgment is appropriate when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.Proc. 56(c). In making this determination, the Court views the evidence in the light most favorable to the non-moving party, according that party the

---

1. In January, 1997, Shelton–Riek filed a complaint with the EEOC alleging discrimination based on sex by the VA. Shelton–Riek complains that in a further attempt to deny her due process, Dr. Story instructed Maria Hall, an EEO manager, to alter this EEO complaint so that it would be untimely. Shelton–Riek also alleges that Hall attempted to comply with Dr. Story's request. (Compl.¶¶ 79–80.) However, Shelton–Riek does not allege that these actions damaged her in any way, and in fact, the complaint was timely filed and investigated by the EEOC. (Def.Ex.B–3.) Shelton–Riek now seeks to recover from Hall for her actions.

2. Plaintiff also seeks to recover from Defendant Dr. Joseph B Sutter, supervisor of Dr. Cooley, for filing affidavits in this earlier suit that "ratif[ied] and attempt[ed] to justify the wrongful conduct of Dr. Cooley and other defendants." (Compl.¶ 78.) Plaintiff further alleges that defendants Sessoms and Burton prepared these affidavits "despite their knowledge of the wrongfulness of Dr. Cooley's conduct" and seeks to recover from Sessoms and Burton for their actions as well. (*Id.*)

benefit of all reasonable inferences. *Bailey v. Blue Cross & Blue Shield of Va.*, 67 F.3d 53, 56 (4th Cir.1995), *cert. denied*, 516 U.S. 1159, 116 S.Ct. 1043, 134 L.Ed.2d 190 (1996). However, judges are not " 'required to submit a question to a jury merely because some evidence has been introduced by the party having the burden of proof, unless the evidence be of such a character that it would warrant the jury in finding a verdict in favor of that party.' " *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251, 106 S.Ct. 2505, 91 L.Ed.2d 202, 213 (1986) (quoting *Schuylkill & Dauphin Imp. Co. v. Munson*, 81 U.S. (14 Wall.) 442, 448, 20 L.Ed. 867, 872 (1871)). Therefore, a motion for summary judgment may be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265, 273 (1986).

### B. DEPRIVATION OF PROPERTY

Shelton–Riek's first count alleges that Defendants' actions "were a violation of Ms. Riek's constitutionally protected property interest in her continued employment at the Salisbury VA and Ms. Riek was deprived of her employment with out [sic] due process in violation of her rights under the Fifth and Fourteenth Amendment [sic] to the United States Constitution." [3] (Compl.¶ 83.) To establish this claim, Plaintiff must show that she had a property interest in her employment and that she was deprived of that interest without sufficient due process. *See Board of Regents v. Roth*, 408 U.S. 564, 569–70, 92 S.Ct. 2701, 33 L.Ed.2d 548, 556–57 (1972). For

purposes of this opinion, this Court will assume that Plaintiff has alleged facts to support her claim that she was deprived of a constitutionally protected property interest without due process of law. *See Bush v. Lucas*, 462 U.S. 367, 373, 103 S.Ct. 2404, 76 L.Ed.2d 648, 654 (1983) (assuming violation of federal employee's constitutional right by supervisors in order to discuss the effect of a comprehensive statutory remedial scheme governing employment-related complaints brought by federal employees on his constitutional claim); *Heaney v. United States Veterans Administration*, 756 F.2d 1215, 1219 (5th Cir.1985) (same).

■ Shelton–Riek asserts a private cause of action against federal officials for violations of her constitutional rights. This claim is a *Bivens*[4] action. *See Bush*, 462 U.S. at 374–75, 103 S.Ct. 2404, 76 L.Ed.2d at 655. Under certain circumstances, a plaintiff may bring a *Bivens* action to recover for damages arising from a violation of the Fifth Amendment. *See Davis v. Passman*, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979) (allowing claim against federal employer for violation of federal employee's Fifth Amendment equal protection rights). In *Bush*, the Court limited the availability of *Bivens* actions for federal employees who seek to recover damages caused by an adverse employment action. The Court held that there can be no relief through a *Bivens* action for a First Amendment violation that "arise[s] out of an employment relationship that is governed by comprehensive procedural and substantive provisions giving meaningful remedies against the United States...." *Bush*, 462 U.S. at 368, 103 S.Ct. 2404, 76 L.Ed.2d at 651.[5] This is so

---

**3.** Because Plaintiff alleges violation of her Due Process rights by federal rather than state actors, her claim arises under the Fifth Amendment, rather than the Fourteenth.

**4.** *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) (allowing suit directly under the Constitution against federal officers for violation of plaintiff's Fourth Amendment rights where no statutory remedy was available).

**5.** Although *Bush* considered a federal employee's claim for First Amendment violations, "the issue is not under which section of the Constitution the action is brought, but who is bringing it and what additional remedies they have available to them." *Harding v. United States Postal Service*, 618 F.Supp. 1330, 1331 (S.D.W.Va.1985) (no *Bivens* action allowed in claim of violation of Fifth Amendment because Congress had created comprehensive administrative relief under both the CSRA

even though the administrative remedies available do not provide complete relief. *See id.* at 388, 103 S.Ct. 2404, 76 L.Ed.2d at 664. The Court reasoned that "[t]he question is not what remedy the court should provide for a wrong that would otherwise go unredressed. It is whether an elaborate remedial system that has been constructed step by step, with careful attention to conflicting policy considerations, should be augmented by the creation of a new judicial remedy for the constitutional violation at issue." *Id.* The Court concluded that it should not augment the statutory scheme.

Like the plaintiff in *Bush,* Shelton–Riek had administrative remedies that addressed her complaints that she was improperly detailed to Social Work Service and constructively discharged. Shelton–Riek's remedies arise under the Civil Service Reform Act ("CSRA"). *See Waiters v. Parsons,* 729 F.2d 233, 236 (3d Cir.1984) (noting VA social worker had appealed dismissal from VA using remedies established by the CSRA); *Freedman v. Turnage,* 646 F.Supp. 1460, 1462–63 (W.D.N.Y.1986) (discussing CSRA remedies available to VA social worker who sought a remedy for a suspension that allegedly violated his First Amendment rights). Among other things, the CSRA establishes remedies for "prohibited personnel actions." "Personnel actions" include "detail[s], transfer[s], or reassignment[s]." 5 U.S.C. § 2302(a)(2)(A)(iv). Employees with the authority to take personnel actions may not do so "if the taking of or failure to take such action violates any law, rule, or regulation implementing, or directly concerning, the merit system principles contained in [5 U.S.C. § 2301]." *Id.* § 2302(b)(12). Among other things, merit system principles require that "selection and advancement should be determined solely on the basis of relative ability . . .," that "all employees should maintain high standards of integrity, conduct, and concern for the public interest," and that "the Federal work force should be used and collective bargaining agreement remedies).

efficiently and effectively." *Id.* § 2301(b)(1),(4), and (5). In addition, an unconstitutional personnel action violates merit system principles. *See id.* § 2301(b)(2). Shelton–Riek alleges that her detail to Social Work Service violated VA regulations and was part of a larger plan to deprive her of her employment, in violation of her Fifth Amendment Due Process rights. (Compl.¶¶ 36, 45–46.) If Shelton–Riek's allegations are true, the action taken against her could be considered a prohibited personnel practice as defined by the CSRA.

In such an instance, an employee who believes that he or she is the victim of a prohibited personnel action may file a complaint with the Office of Special Counsel ("OSC") of the Merit Systems Protection Board ("MSPB"). *See* 5 U.S.C. § 1214(a)(1)(A). The OSC investigates the alleged prohibited personnel action and may petition the MSPB for corrective action. *See id.* § 1214(b)(2). The MSPB may order that the employee be returned to the position she would have held had the action not taken place and may award back pay, consequential damages, and certain costs associated with the action, including attorney's fees. *See id.* § 1214(g). Therefore, because the Defendants' decision to detail Shelton–Riek away from the SIPU and efforts to deprive her of her employment could be considered a prohibited personnel action, she had an administrative remedy available to her through the OSC and the MSPB.

Not only does the CSRA provide a remedy for Shelton–Riek's claims that she was improperly detailed from the SIPU, it also provides a remedy for Shelton–Riek if, as she alleges, she was constructively discharged. *See Braun v. Department of Veterans Affairs,* 50 F.3d 1005, 1007 (Fed. Cir.1995) ("If, however, an agency coerced a resignation, that is tantamount to a removal, and the [MSPB] has jurisdiction over the 'constructive removal.'") A removal is considered an "adverse action"

rather than a "prohibited personnel action." *See* 5 U.S.C. § 7512. When an employee alleges that he or she has suffered an adverse action, the action may be appealed directly to the MSPB, rather than proceeding through the OSC. *See id.* § 7513(d). The MSPB has authority to fashion appropriate remedies. *See id.* § 7701. Therefore, Shelton–Riek had an administrative remedy not only for the VA's allegedly improper decision to detail her away from the SIPU, but also for her alleged constructive discharge.

Other courts considering facts similar to those presented in this case have reached the conclusion that, under *Bush,* a plaintiff's *Bivens* action was barred because of the existence of a comprehensive statutory scheme governing the federal employer/employee relationship. In *Heaney v. United States Veterans Administration,* the plaintiff, a VA surgeon, alleged that as a result of his advocacy for the patients, staff members submitted fraudulent surgical records to a panel investigating his practice. He further alleged that due to their actions and the investigation, he lost his surgical privileges. Finally, he claimed that there was a seven month delay in his reinstatement after his name was cleared. *See Heaney,* 756 F.2d at 1217. As a VA surgeon, Heaney did not have recourse to the CSRA, but to the disciplinary rules of the Department of Medicine and Surgery, which provided less complete remedies than the CSRA. *See id.* at 1218. Even considering the reduced protection of Heaney's administrative remedies, the court upheld the dismissal of his *Bivens* action, reasoning that "[w]here a coordinate branch of the government has provided a government employee with a procedure under which a constitutional claim arising out of the employment relationship is cognizable and some measure of relief may be obtained, a nonstatutory damage action is not available for discharge, demotion or other adverse personnel actions absent clear evidence of an intent by the coordi-

nate branch not to foreclose the nonstatutory remedy." *Id.*

In another similar case, the District Court for the Eastern District of Arkansas dismissed a plaintiff's *Bivens* action against VA employees. *Hicks v. Brown,* 929 F.Supp. 1184 (E.D.Ark.1996). In *Hicks,* the plaintiff, a staff nurse at a Veterans Administration Medical Center, alleged that after the VA learned that she had married a man known to have a "confrontational relationship" with the VA, she was, among other things, denied promotions, made the subject of "ostensible[ ] 'patient' complaints," and reassigned from her position in the Ward Without Walls Unit. *Id.* at 1186. The *Hicks* court held that "in light of the comprehensive remedial structure of the CSRA" plaintiff could not maintain a *Bivens* action. *Id.* at 1188.

Given the Supreme Court's holding in *Bush* that a *Bivens* action is not available when Congress has created a comprehensive structure that provides meaningful remedies for the complaints raised by a federal employee and given the availability of such remedies to Shelton–Riek, this Court concludes that Shelton–Riek may not bring a constitutional claim against the Defendants for dismissing her from her federal employment and thereby depriving her of her constitutionally protected property interest in her employment without due process of law. Shelton–Riek had the opportunity to seek relief under the CSRA but failed to pursue her administrative remedy. Therefore, this Court will grant Defendants' Motion for Summary Judgment on Plaintiff's claim that Defendants deprived her of her constitutionally property interest in government employment without due process of law.

### C. DEPRIVATION OF LIBERTY INTEREST IN REPUTATION

Plaintiff next claims that Defendants' actions "violat[ed] ... Ms. Riek's constitutionally protected liberty interest in her professional reputation and Ms. Riek was deprived of her this [sic] liberty interest in violation of her rights under the Fifth and Fourteenth Amendment [sic] to the United States Constitution."[6] (Compl.¶ 86.)

---

**6.** Again, because Plaintiff's suit is against federal actors, her claim arises under the Fifth

Taking the facts alleged by Shelton–Riek as being true for the purpose of considering Defendants' Motion for Summary Judgment, it would be established that Defendants filed or participated in the filing of complaints against Shelton–Riek with the State Board without providing Shelton–Riek an opportunity to clear her name. As a result of these statements, the State Board began an investigation of Shelton–Riek. Shelton–Riek was ethically required to reveal the investigation to her private clients, which resulted in her losing clients and contracts with HMOs and insurance providers. These allegations form the basis of Shelton–Riek's claim that Defendants deprived her of her constitutionally protected liberty interest in her reputation without due process.

■ As it is used in defining constitutional rights under the Fifth Amendment's Due Process Clause, " '[l]iberty' . . . [is] a broad and majestic term" that encompasses many personal interests. *Board of Regents v. Roth,* 408 U.S. at 571, 33 L.Ed.2d at 557.[7] However, the range of liberty interests protected by due process is "not infinite." *Id.* at 570, 92 S.Ct. 2701, 33 L.Ed.2d at 557. To determine whether a person is entitled to due process, the court must determine whether the interest violated is one protected by the due process clause. *See id.* at 571, 92 S.Ct. 2701, 33 L.Ed.2d at 557.

■ Shelton–Riek claims that Defendants' actions deprived her of her constitutionally protected liberty interest in her reputation. However, "injury to reputation by itself [is] not a 'liberty' interest protected under the Fourteenth Amendment." *Siegert v. Gilley,* 500 U.S. 226, 233, 111 S.Ct. 1789, 114 L.Ed.2d 277, 288 (1991) (citing *Paul v. Davis,* 424 U.S. 693, 708–709, 96 S.Ct. 1155, 47 L.Ed.2d 405, 418 (1976)). "So long as damage flows from

injury caused by the defendant to the plaintiff's reputation . . . it is not recoverable in a *Bivens* action." *Siegert,* 500 U.S. at 233, 111 S.Ct. 1789, 114 L.Ed.2d at 288. Therefore, to recover for deprivation of a liberty interest, Shelton–Riek must establish more than that Defendants' statements were defamatory.

■ In order to establish that she has been deprived of a liberty interest, Shelton–Riek must show: 1) that the charges made by Defendants were false; 2) that the charges were made public; 3) that the charges were made in the course of discharge or serious demotion; and 4) that the "charges against [her] . . . 'might seriously damage [her] standing and associations in [her] community' or otherwise 'imposed on [her] a stigma or other disability that foreclosed [her] freedom to take advantage of other employment opportunities.' " *Stone v. University of Md. Medical Sys. Corp.,* 855 F.2d 167, 173 n. 5 (4th Cir.1988) (quoting *Roth,* 408 U.S. at 573–75, 92 S.Ct. 2701, 33 L.Ed.2d at 558–59).

Shelton–Riek's pleadings are sufficient to state a claim with regard to three of the four elements required by *Stone.* First, Shelton–Riek alleges that the claims made were false. (Compl. ¶ 56.) Second, the charges were made public to the extent that Dr. Cooley revealed the charges to the State Board. As a result, Shelton–Riek had to make the charges more public in that she was ethically required to reveal the State Board's investigation to potential clients. (Compl.¶ 61.) Third, Shelton–Riek's pleadings allege that the statements were made in the course of what she contends was a constructive discharge. *See Stone,* 855 F.2d at 173 (if a " 'resignation' was so involuntary that it amounted to a constructive discharge, it must be considered a deprivation by state action trigger-

rather than the Fourteenth Amendment Due Process Clause.

**7.** Although *Roth* considered a claim under the Fourteenth Amendment Due Process clause, the analysis of a claim that defamation by a

public official deprived a plaintiff of a constitutionally protected liberty interest is the same under the Fifth and Fourteenth Amendments. *Paul v. Davis,* 424 U.S. 693, 702, n. 3, 96 S.Ct. 1155, 47 L.Ed.2d 405, 414, n. 3 (1976).

ing the protections of the due process clause"). Nevertheless, Shelton–Riek still must present evidence to show that during the course of her discharge, "superiors made charges against [her] that 'might seriously damage [her] standing and associations in [her] community' or otherwise 'imposed on [her] a stigma or other disability that foreclosed [her] freedom to take advantage of employment opportunities.'" *Id.* at 173, n. 5 (quoting *Roth,* 408 U.S. at 573–75, 92 S.Ct. 2701, 33 L.Ed.2d at 558–59).

▪ Shelton–Riek does not allege that Defendants' defamatory statements damaged her by causing the VA to discharge her. Instead, she has alleged that Defendants deprived her of her liberty interest in her reputation by initiating the State Board's investigation of her, which forced her to disclose to clients that she was under investigation. This in turn caused a temporary reduction of business in her private practice. A Declaration submitted by Shelton–Riek reveals in detail the damages of which she complains. She contends that the required disclosure of the investigation caused her to lose clients and business contracts while the investigation was pending. In addition, Shelton–Riek asserts that the disclosure had "an impact on [her] ability to apply for Preferred Provider Status with many HMOs and Insurance Providers," and "foreclosed" her opportunity to renew her license in Louisiana. Finally, Shelton–Riek charges that Defendants' actions "effectively prevented [her] from seeing [sic] other employment for the seven months the investigation took to complete." (Pl. Ex. RR ¶¶ 7–11.) However, it is important to note that Shelton–Riek does not allege that she was legally unable to practice her profession as a social worker during the investigation. Further, she acknowledges that she continues to work as a therapist. (*Id.* ¶ 1.)

In Plaintiff's Response to Defendants' Motion to Dismiss or in the Alternative for Summary Judgment, Shelton–Riek addresses the fourth element of *Stone.*

Shelton–Riek argues that the reduction in income and employment opportunities resulting from Defendants' complaint to the State Board and her required disclosure of the State Board's investigation to her clients amounted to a foreclosure of her professional opportunities. Therefore, Shelton–Riek contends that Defendants' providing information to the State Board without offering her a hearing, deprived her of her constitutionally protected liberty interest in her reputation without due process. For this proposition, Shelton–Riek cites *Christhilf v. Annapolis Emergency Hospital Ass'n, Inc.,* 496 F.2d 174 (4th Cir.1974), *overruled on other grounds, Modaber v. Culpeper Mem. Hosp., Inc.,* 674 F.2d 1023 (4th Cir.1982). In *Christhilf,* the court found that the hospital had violated Dr. Christhilf's due process rights by denying him hospital privileges without an appropriate hearing when "denial of privileges might effectively foreclose Dr. Christhilf's practicing in the area because of the harm to his professional reputation and because of the lack of other facilities comparable to those of the hospital within 20 miles of Annapolis." *Id.* at 178.

*Christhilf* is distinguishable from this case on two important grounds. First, in *Christhilf,* the court assumed that as a result of the defamatory statements against him, Dr. Christhilf would not be able to practice medicine in the area. In contrast, Shelton–Riek has alleged that the State Board's investigation resulted in a temporary reduction in income, but that she continued to be able to practice her profession. Thus, Dr. Christhilf suffered the functional equivalent of a loss of license, while the Plaintiff has not alleged such a detrimental loss.

▪ Plaintiff's reliance is also misplaced because the Fourth Circuit decided *Christhilf* before the Supreme Court's decisions in *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405, and *Siegert v. Gilley,* 500 U.S. 226, 111 S.Ct. 1789, 114 L.Ed.2d 277. In *Paul,* the Court clarified the requirements for showing a deprivation of a liberty interest, stating that in order to

establish a violation of due process, the plaintiff must show that "a right or status previously recognized by state law [was] distinctly altered or extinguished." *Paul,* 424 U.S. at 711, 96 S.Ct. 1155, 47 L.Ed.2d at 420. In *Siegert,* the Court held that "[d]efamation, by itself, is a tort actionable under the laws of most States, but not a constitutional deprivation." *Siegert,* 500 U.S. at 233, 111 S.Ct. 1789, 114 L.Ed.2d at 288. *Paul* and *Siegert* make clear that an employee can state a claim for deprivation of his or her constitutionally protected liberty interest only when the employee has been deprived of a legal right or status as a result of defamatory statements made by government actors. *See Paul,* 424 U.S. at 711, 96 S.Ct. 1155, 47 L.Ed.2d at 420; *Siegert,* 500 U.S. at 233, 111 S.Ct. 1789, 114 L.Ed.2d at 288.[8] "Most defamation plaintiffs attempt to show some sort of special damage and out-of-pocket loss which flows from the injury to their reputation. But so long as such damage flows from injury caused by the defendant to a plaintiff's reputation, it may be recoverable under state tort law, but it is not recoverable in a *Bivens* action." *Siegert,* 500 U.S. at 234, 111 S.Ct. 1789, 114 L.Ed.2d at 288. Holdings by the Fourth Circuit and other courts following *Paul* and *Siegert* explain that a defamatory statement by itself that may make it more difficult for a plaintiff to find work because it damages the plaintiff's reputation does not violate the plaintiff's constitutionally protected liberty interest.

This was made clear by the Fourth Circuit in *Randall v. United States,* 30 F.3d 518 (4th Cir.1994), *cert. denied* 514 U.S. 1107, 115 S.Ct. 1956, 131 L.Ed.2d 849 (1995), in which the court had the opportunity to apply *Paul* and *Siegert.* In *Randall,* the Army took action restricting the practice privileges of the plaintiff, Randall, who was an Army anesthesiologist. *Id.* at 521. The Army reported the restrictions on Randall's practice to the National Practitioner Data Bank as an adverse action. Randall voluntarily left the Army before the Army limited her privileges. *See id.* Nonetheless, the Army reported the restriction to the National Practitioner Data Bank because hearings on the restrictions began while Randall was still in the Army. *See id.* at 521, n. 3. In her claim against the Army for deprivation of her constitutionally protected liberty interest, Randall did not allege that the Army's limitation on her practice and the report to the Data Bank violated her constitutionally protected liberty interest by limiting her practice as an Army anesthesiologist or by preventing her from practicing as an anesthesiologist outside of the Army. Instead, Randall claimed that the Army violated her liberty interest because the Army's report "denied her the right to practice her profession free from an imposed stigma." *Id.* at 522. Despite this contention, the Fourth Circuit affirmed the district court's decision to dismiss the case. The court held that "action which inflicts a stigma on the reputation of a plaintiff causing that plaintiff hardship in obtaining employment is harm to reputation that does not rise to the level of a constitutional deprivation." *Id.* at 522 (citing *Paul,* 424 U.S. at 708–709, 96 S.Ct. 1155, 47 L.Ed.2d at 418; *Siegert,* 500 U.S. at 233, 111 S.Ct. 1789, 114 L.Ed.2d at 288).

**8.** A plaintiff may state a claim for deprivation of a constitutionally protected liberty interest in reputation if defamatory statements made by the government deprive a plaintiff of government employment. *See Paul,* 424 U.S. at 706, 47 L.Ed.2d at 416–17. However, the VA did not discharge Shelton–Riek, and indeed offered her the opportunity to return to her position as SIPU coordinator. (Compl.¶ 69.) Instead, Shelton–Riek alleges that the damage to her health caused by the Defendants' accumulated conduct forced her to take medical leave, and, ultimately, disability retirement.

(Compl.¶¶ 68, 81.) Because Shelton–Riek has not alleged that Defendants' defamatory statements caused her discharge from government employment, this opinion will only consider whether a right or status other than her government employment was "distinctly altered or extinguished." *Paul,* 424 U.S. at 711, 96 S.Ct. 1155, 47 L.Ed.2d at 420. In particular, the Court will only consider Shelton–Riek's allegations that Defendants deprived Shelton–Riek of her constitutionally protected liberty interest in her professional reputation. (Compl.¶ 86.)

As *Randall* makes clear, after *Paul* and *Siegert,* when faced with the question of whether a defendant's allegedly defamatory statements have deprived a plaintiff of his or her constitutionally protected liberty interest, courts must determine whether the plaintiff's claims rise to the level of constitutional deprivation or are merely claims for damage to reputation. To draw this distinction, courts often look to see if the defendant's defamatory statements have so damaged a plaintiff's reputation that the plaintiff is unable to find employment or have otherwise created a bar that prevents the plaintiff from practicing his or her profession. For example, the Seventh Circuit considered a case in which the F.B.I. distributed a memorandum to potential employers of the plaintiff. The memorandum contained allegations that the plaintiff had engaged in illegal activities. The court held that there was no deprivation of the plaintiff's liberty interest because the memorandum's allegations of wrongdoing did not amount to a stigma preventing him from finding employment. In addition, "[n]o legal barrier to [the plaintiff's] future employment in the government or elsewhere was ever imposed...." *Perry v. Federal Bureau of Investigation,* 781 F.2d 1294, 1300–1302 (7th Cir.1986). *See also Kartseva v. Department of State,* 37 F.3d 1524 (D.C.Cir. 1994) (plaintiff may state a claim for deprivation of constitutionally protected liberty interest in reputation if statements by the government either formally exclude her from work on government projects or otherwise prevent her from pursuing her chosen career); *Johnson v. Morris,* 903 F.2d 996, 1000 (4th Cir.1990) (limitation on advancement in one's job resulting from public announcements of reasons for demotion is not sufficient to state a claim for deprivation of liberty interest in reputation); *Chilingirian v. Boris,* 882 F.2d 200, 205–206, n. 8 (6th Cir.1989) ("A charge that merely makes a plaintiff less attractive to other employers but leaves open a definite range of opportunity does not constitute a liberty deprivation."); *Goulding v. Fein-*

*glass,* 811 F.2d 1099, 1102–1103 (7th Cir. 1987) (noting that the plaintiff had no claim for deprivation of his liberty interest in his job as a lawyer when defamatory statements by the government did not result in the revocation or suspension of his license); *Munson v. Friske,* 754 F.2d 683, 693 (7th Cir.1985) ("A liberty interest is not implicated where the charges merely result in reduced economic returns and diminished prestige, but not permanent exclusion from or protracted interruption of employment."); *Stretten v. Wadsworth Veterans Hosp.,* 537 F.2d 361, 366 (9th Cir.1976) (charges that might deprive a plaintiff of a constitutionally protected liberty interest are those that result in "permanent exclusion from, or protracted interruption of, gainful employment within the trade or profession"); *Rogers v. Berger,* 682 F.Supp. 302, 304 (W.D.Va.1988) (attorney's loss of present and future clients does not state a claim of deprivation of liberty interest because there is no legal right to the patronage of clients and plaintiff's status as an attorney had not been altered).

In the case before this Court, Shelton–Riek alleges that Defendants' defamatory statements to the State Board deprived her of her constitutionally protected liberty interest in that they caused a reduction in her income from her private practice by damaging her professional reputation. However, as *Paul* and *Siegert* make clear, in order to state a claim that she has been deprived of her constitutionally protected liberty interest, she must show that Defendants' actions caused some alteration in a previously recognized right or status. As *Randall* and the cases cited above show, to establish such an alteration she must show that Defendants' actions had the practical or legal effect of preventing her from practicing her profession as a social worker. Shelton–Riek only alleges that Defendants' defamatory statements harmed her reputation, causing a reduction in her income. *Randall* clearly states that damages that result from harm to reputation alone do not rise to the level of a constitutional deprivation. Therefore, the Court finds

that Defendants are entitled to Summary Judgment as a matter of law with respect to Shelton–Riek's claim that Defendants violated her constitutionally protected liberty interest in her reputation by making defamatory statements about her without providing due process.

III.   CONCLUSION

For the above stated reasons, Defendants' Motion for Summary Judgment [Document # 7] is granted.  An Order and Judgment in accordance with this Memorandum Opinion will be filed contemporaneously herewith.

### ORDER AND JUDGMENT

For the reasons set forth in the MEMORANDUM OPINION filed contemporaneously herewith,

IT IS ORDERED, ADJUDGED, AND DECREED that Defendants B.W. Story, David S. Katzin, Joseph B. Sutter, Cynthia Spry, Jo E. Cooley, Keith D. Ruether, Robert Hackett, Sharon Machovina, Ed Sessoms, Maria Hall, and Tanya B. Burton's Motion for Summary Judgment [Document # 7] is granted.   Accordingly, Plaintiff's claims are hereby DISMISSED with prejudice.