[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-14645

_____

D.C. Docket No. 8:18-cv-01269-MSS-JSS

SAID I. HAKKI, M.D.,

Plaintiff-Appellant,

versus

SECRETARY, DEPARTMENT OF VETERANS AFFAIRS,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(August 3, 2021)

Before JORDAN, BRASHER, and ANDERSON, Circuit Judges.

ANDERSON, Circuit Judge:

A physician's discharge from employment with the Department of Veterans

Affairs ("VA") over a decade ago gives rise to the questions of federal subject-

matter jurisdiction addressed in this case. The physician, Plaintiff-Appellant Said

I. Hakki, M.D. ("Dr. Hakki"), challenged his discharge in federal court, but the district court held that it did not have jurisdiction to hear his claims brought pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 702, and the Mandamus Act, 28 U.S.C. § 1361, because the Veterans' Benefits Act ("VBA"), 38 U.S.C. § 7461 et seq., is a comprehensive statutory scheme governing the discipline of VA employees and was the exclusive remedy for review of Dr. Hakki's employment discharge.  The district court also held that while the VBA did not bar Dr. Hakki's procedural due process claims, the claims were not colorable because he received all the process due to him.  After thorough review and with the benefit of oral argument, and as explained below, we conclude that the district court did not have subject-matter jurisdiction over any claim under the APA because the VBA is a comprehensive statutory scheme that precludes APA review, Dr. Hakki presents no colorable due process claim and thus there is no equitable constitutional jurisdiction, and Dr. Hakki failed to establish a clear right to relief or the VA's clear duty to act and thus there is no Mandamus Act jurisdiction.

2

## I.     BACKGROUND

Dr. Hakki began working as a urologist at the Bay Pines VA Health Care System ("Bay Pines") in Pinellas County, Florida in 1986.[1]  In 2003, the U.S. Department of Defense asked Dr. Hakki, and he agreed, to assist in the efforts to develop the government and healthcare systems in Iraq.  Dr. Hakki worked as an advisor to the Iraqi Prime Minister's office and led the Iraqi Red Crescent ("IRC"). The VA granted him leave without pay—abbreviated as "LWOP"—in connection with his work in Iraq.  In March 2007, Dr. Hakki requested and was granted an extension of LWOP through December 31, 2008.  Dr. Hakki requested several additional extensions of LWOP, which, along with the VA's decisions regarding those requests, eventually gave rise to his discharge.  We review those requests and the VA's related decisions.  Then, we proceed to explain the procedures that more immediately led to Dr. Hakki's discharge and related litigation.

---

[1]     Bay Pines operates within the VA Sunshine Healthcare Network, which is designated as Veterans Integrated Services Network 8 (or "VISN 8") and is one of the 18 regional healthcare networks operated by the Veterans Health Administration ("VHA").  See 48 C.F.R. § 802.101 ("VISN means . . . an integrated network of VA facilities that are focused on pooling and aligning resources to best meet local needs in the most cost-effective manner and provide greater access to care."); Veterans Integrated Services Networks (VISNs), Veterans Health Administration, U.S. Dep't of Veterans Affairs, https://www.va.gov/HEALTH/visns.asp.  The VHA is a part of the Department of Veterans Affairs.  38 U.S.C. §§ 301(c), 7301(a).  "The primary function of the [VHA] is to provide a complete medical and hospital service for the medical care and treatment of veterans, as provided in" Title 38 and regulations.  Id. § 7301(b).

A. Requests for Extension of LWOP and the VA's Decisions

On August 1, 2008, the VA notified Dr. Hakki that his LWOP would be terminated and that he was expected to return to work at Bay Pines on August 4, 2008. The VA had learned from the Department of State that his duties with the IRC had ended. Dr. Hakki filed a grievance with the VA on August 28, 2008, asserting he needed to remain in Iraq because Iraq's Prime Minister had brought false criminal charges against him and illegally removed him from his position at the IRC. On September 26, 2008, the VA sustained the grievance, rescinded the August 1 letter, and reinstated Dr. Hakki's term of LWOP through Wednesday, December 31, 2008. In conjunction with the decision to sustain his grievance, the VA directed him to return to duty on Friday, January 2, 2009.

On October 3, 2008, Dr. Hakki's LWOP was rescinded for a second time. The Bay Pines Hospital Director, Wallace Hopkins, wrote that the State Department notified the VA that the IRC had been dissolved effective July 31, 2008, by the Iraqi Prime Minister and thus the basis for Dr. Hakki's LWOP no longer existed. Dr. Hakki filed another grievance, which was granted by Bay Pines Hospital Director Hopkins on October 28, 2008. In sustaining the grievance, the October 28 letter explained that the VA reinstated LWOP through December 31, 2008, with a return date of January 2, 2009. In a separate letter dated November 3, 2008, Dr. Hakki was again informed that his return date remained January 2, 2009.

4

On December 19, 2008, Dr. Hakki requested a six-month extension of LWOP from the existing expiration date of December 31, 2008, to a new date of June 30, 2009, because he needed to defend himself against the criminal charges, to be available for testimony in related civil matters, and to pursue his own defamation lawsuits.

By letter dated December 23, 2008, Hopkins denied this request. This denial letter underlies a large part of Dr. Hakki's theory in this case. Hopkins addressed one of Dr. Hakki's attorneys in the December 2008 LWOP denial letter, stating that "there [wa]s no basis upon which to justify the continuation of Dr. Hakky's[2] LWOP." He explained the decision as follows:

> VA Handbook 5011 stipulates that LWOP decisions require there be a certainty regarding the date of the employee's return. During our meeting on October 27, 2008, at which you were in attendance, [co-counsel] requested Dr. Hakky's LWOP be extended through December 31, 2008, and expressed Dr. Hakky's wish to return to duty at the beginning of 2009. Your written request does not establish that it would serve the Department of Veterans Affairs interests by approving an extension of LWOP beyond the December 31, 2008 deadline. This most recent request demonstrates multiple personal issues of Dr. Hakky's and seems to indicate there is uncertainty of Dr. Hakky's return date; VA regulation requires certainty in order to approve LWOP. Therefore, Dr. Hakky's request for LWOP through June 30, 2009 is denied. . . . As stated in my letter to Dr. Hakky dated November 3, 2008, of which [co-counsel] received a copy, I direct Dr. Hakky to return to duty at the Bay Pines VA Healthcare System, Surgical Service, effective Friday, January 2, 2009.

---

[2]    The record includes some references to Plaintiff's name spelled as "Hakky." We understand both spellings of the name to refer to the same person, Plaintiff-Appellant, and we will use the spelling used in the parties' appellate briefs and other filings (i.e., "Hakki").

We will refer to this decision and the request that prompted it, as the December 2008 LWOP denial and the December 2008 LWOP request (respectively) or in combination.

On December 31, 2008—i.e., the last day of his approved LWOP—Dr. Hakki responded to the December 2008 LWOP denial. In his response, Dr. Hakki described the LWOP denial letter as "suggest[ing] that the request for LWOP seems to indicate there is uncertainty of Dr. Hakky's return date." Dr. Hakki "advised that [his] request for LWOP through June 30, 2009 means he would return to duty on July 1, 2009," and stated that "this will confirm that Hakky wishes to return to duty on July 1, 2009 and will not request any further LWOP." "In light of the certainty of Dr. Hakky's return, as reaffirmed herein," the letter explained, "we ask that you reconsider your decision. In the meanwhile, we have filed a grievance concerning your decision." In addition to this response, on December 31, 2008, Dr. Hakki filed a union grievance challenging the December 2008 LWOP denial.

Dr. Hakki did not return to work two days later on the established return date of January 2, 2009. Because he did not return to work, and because he was absent without approval of leave, he was considered to be absent without leave, or "AWOL," as of January 2, 2009.

6

On January 28, 2009, Hopkins denied the December 31 union grievance.[3] Hopkins explained that he had considered Dr. Hakki's grievance, as well as previous related decisions, and "determined that due to the extended length of Dr. Hakky's absences to date, related to his personal affairs, and because there is no way to definitively determine the actual date his personal affairs will be resolved," extended LWOP was not in the VA's best interest. The letter also explained that Dr. Hakki was charged as AWOL since January 2, 2009, because he did not return on that date as directed, and he would continue to be considered AWOL.

The union, the American Federation of Government Employees, requested arbitration of the January 28 grievance denial. A settlement was proposed that would require Dr. Hakki to report to work on July 1, 2009, and would set Dr. Hakki's status as AWOL from January 2 through June 30, 2009. Dr. Hakki did not sign the proposed agreement.[4]

On June 22, 2009, Dr. Hakki requested an extension of LWOP for the period of July 1, 2009, through September 30, 2009. The VA did not respond to this June 22 request.

---

[3]    In denying the December 31 union grievance, Hopkins explained that he had met with Dr. Hakki's counsel and discussed the grievance on January 20, 2009; during the meeting, they both agreed that Hopkins's response to the grievance could be submitted at Hopkins's convenience.

[4]    Dr. Hakki also filed an unfair labor practice charge against the VA and the American Federation of Government Employees with the Federal Labor Relations Authority, which did not issue a complaint.

B. Proposed Discharge and Grievance

On July 8, 2009, Dr. Hakki, having not yet returned to work, was issued a proposed discharge—i.e., a proposal that he be discharged from his employment with the VA—by Dr. Terry Wright, the Chief of the Surgical Service.  Dr. Wright explained in the proposed discharge that Dr. Hakki had been approved for LWOP through December 31, 2008, and that a request to extend LWOP was denied in December 2008, i.e., the December 2008 LWOP request and denial.  Furthermore, Dr. Hakki, though directed to return to Bay Pines on January 2, 2009, failed to return and was charged AWOL since January 2, 2009.  This meant that as of the date of the proposed discharge, he had been AWOL for 26 weeks.  Allowing his continued unauthorized absence did not support the VA's mission or the efficiency of the service, and he was charged with unauthorized absence.  The proposed discharge continued by outlining Dr. Hakki's procedural rights, including an opportunity to be heard, to inspect the evidence on which the proposed discharge was based, and to be represented by counsel.

Dr. Hakki responded to the proposed discharge on July 21, 2009.  He explained his belief that he should not be discharged and why he believed his continued absence supported the mission of the VA and the efficiency of the service as "set forth in both Dr. Hakky's December 19, 2008 . . . and June 22, 2009 . . . request[s] for LWOP, which [we]re both incorporated by reference."  He

stated, "The period of Dr. Hakky's purported AWOL upon which the proposed discharge is based is, of course, the very time period for which Dr. Hakky previously sought leave without pay ('LWOP') by a request dated December 19, 2008"—i.e., the December 2008 LWOP request. Dr. Hakki's July 2009 response continued: "Mr. Hopkins denied that request for LWOP as well as a subsequent grievance of that denial"—i.e., the December 2008 LWOP denial. He expressed his understanding that the settlement agreement arising from the union arbitration—though admittedly objected to by Dr. Hakki and his counsel— purported to permit Dr. Hakki to return to work on July 1, 2009. However, Dr. Hakki acknowledged that he had in fact been carried as AWOL and that the proposed discharge was based on his 26-weeklong AWOL status from January 2, 2009, through July 1, 2009. He also requested that Hopkins be recused from any determination related to Dr. Hakki's proposed discharge due to bias.[5]

In response to Dr. Hakki's request for Hopkins to be recused, a human resources consultant with the VA in Washington, D.C. recused Hopkins. In addition to granting the request to recuse Hopkins, the consultant recused the network director for VISN 8, i.e., the head of the VA network that included Bay Pines. Two VISN 10 directors were appointed to hear Dr. Hakki's grievance

---

[5]    In his July 2009 response to the proposed discharge, Dr. Hakki also noted the failure of the VA to respond to his June 2009 LWOP request, alleged the VA interfered with the arbitration of the union grievance, and alleged unfair labor practices.

9

regarding his proposed discharge.  The VISN 10 directors were Linda Smith, who would make a recommendation, and Jack Hetrick, who would make the final decision regarding discharge.

C.  Proceedings on the Proposed Discharge and Subsequent Discharge

On October 9, 2009, Dr. Hakki provided an oral response to the proposed discharge via telephone call with Smith and a human resources advisor.  After the call, Smith prepared a summary and recommendation to Hetrick.

Smith recommended that the discharge be upheld because Dr. Hakki was AWOL from January 2, 2009, to June 30, 2009, despite being notified of his return date of January 2, and his personal reasons that formed the basis for his request to remain on LWOP did not serve the VA.  Smith further explained that, as Dr. Hakki admitted, the criminal matters in Iraq had not been resolved and additional criminal charges might result in the future.

On November 13, 2009, Hetrick issued a letter notifying Dr. Hakki that "in conjunction with the July 8, 2009, Notice of Proposed Removal, a decision ha[d] been made to remove [Dr. Hakki] from employment with [Bay Pines] effective November 30, 2009."  Hetrick explained the reasons for the decision to discharge Dr. Hakki, which included that Dr. Hakki had been "uncertain as to when [he] can return to the duties and responsibilities of [his] position, due to unresolved criminal

10

matters." Hetrick responded to Dr. Hakki's reference to the arbitration settlement proposal, as follows:

> [A] careful review of the settlement agreement reveals that in order for you to be designated as '*Absent without Leave*,' you were required to report to duty by July 1, 2009. By your own admission, you failed to return to duty by the established deadline. This aforementioned failure therefore, supports the charge as set forth in the Notice of Proposed Removal.

But the reasons Hetrick gave for sustaining the proposed discharge decision focused on other considerations: "Careful consideration was also given to the frequency of your conduct. Specifically, since January 2, 2009, you have been charged Absence without Leave (AWOL) for twenty-six (26) weeks."

On December 7, 2009, Dr. Hakki challenged his discharge. Dr. Hakki argued in a grievance that his proposed discharge had been purportedly based on an alleged failure to return to work on January 2, 2009, and his AWOL status through June 2009, but he asserted that Hetrick's discharge decision was in fact based on his failure to return on July 1, not January 2, a violation of due process and VA Handbook rules. He also simultaneously relied on the arbitration settlement agreement as extending his return date to July 1, 2009, while arguing it was illegal because he did not approve of it (but rather objected to it) and thus the

Due Process Clause of the Fifth Amendment had been violated.[6]  As relief, Dr.

Hakki requested reversal of Hetrick's discharge decision, reinstatement, legal fees,

consequential damages, expungement regarding his AWOL status, and LWOP

through December 30, 2009.  This grievance was denied after review by Susan

Bowers, the VISN 18 Network Director, who made a recommendation to VA

Deputy Under Secretary William Schoenhard.

D. *Hakki I*

In October 2010, Dr. Hakki filed a complaint in federal district court

challenging the VA's final decision to discharge him, alleging due process

violations and claims pursuant to the APA, 5 U.S.C. § 702, and Mandamus Act, 28

U.S.C. § 1361.  As the parties and the district court in the underlying proceedings

in this case did, we will refer to the first lawsuit filed in 2010 and that court's

dispositive decision in the first lawsuit in 2014 as "Hakki I."

The Hakki I court entered judgment and remanded the case back to the VA

on March 31, 2014, because the VA had conceded that the procedures governing

Dr. Hakki's discharge were inconsistent with the VA's required procedures

because they did not include an opportunity for cross-examination.  See Order at 5,

Hakki v. Shinseki, No. 10-CV-2212 (M.D. Fla. Mar. 31, 2014), ECF No. 79.  The

---

[6]     In the grievance regarding Hetrick's discharge decision, Dr. Hakki also alleged Hetrick did not review certain documents and that there were ex parte communications between VISN 8 and 10 personnel.

12

court rejected Dr. Hakki's request for the court to issue a writ of mandamus requiring Dr. Hakki's reinstatement and an award of full back pay. Id. at 5–6. He had "not carried his burden of showing that he has a right to this extraordinary remedy as a means of achieving any form of relief, especially not reinstatement and damages," and he had an adequate alternative remedy in the comprehensive statutory scheme afforded to VA physicians, 38 U.S.C. §§ 7461–64. Id. at 6–7. This comprehensive statutory scheme also compelled the court to deny any further claim for damages. Id. at 7–8 (citing United States v. Fausto, 484 U.S. 439, 448–49, 108 S. Ct. 668, 674, 98 L. Ed. 2d 830 (1988)).

  E. The Second Set of Procedures and Decision Related to the Discharge

  On remand to the VA, Dr. Michael Mayo-Smith, the Network Director for the New England Healthcare System in VISN 1, was appointed to make a recommendation to Steve Young, the VA Deputy Under Secretary for Operations and Management, who would make the final decision in this second set of procedures with respect to Dr. Hakki's discharge. A hearing was held on June 6 and 7, 2017, during which testimony was heard and cross-examination was conducted.

  On December 22, 2017, Mayo-Smith recommended to Young that Dr. Hakki's grievance regarding his discharge be granted because Hopkins (who denied Dr. Hakki's December 2008 LWOP request) and Hetrick (who sustained

the proposed discharge, making effective the discharge) relied upon two incorrect reasons in making their respective decisions.  Both Hopkins and Hetrick made their decisions based on, first, the lack of certainty as to Dr. Hakki's return date and, second, his continued LWOP not serving the VA's interest.  The first reason was incorrect because VA Handbook 5011, Part III Leave, Section 13, Leave Without Pay, does not require a definitive return date, just a "reasonable expectation that the employee will return to duty," and Dr. Hakki had consistently communicated his commitment to return to Bay Pines and the VA never expressed any concern about Dr. Hakki's not returning on a firm date.  The second reason was wrong because if the VA "abandoned" individuals like Dr. Hakki, it would impair future recruiting.  For these reasons, Mayo-Smith recommended that Dr. Hakki's grievance denial be reversed and the discharge grievance be granted, that his request for LWOP be retroactively granted from December 31, 2009, through March 31, 2018, and that any reference to his AWOL status in his records be expunged.  Mayo-Smith recommended that consequential damages be denied.

On April 18, 2018, Young issued the final decision, which rejected Mayo-Smith's recommendations, and Dr. Hakki's discharge grievance was denied. "After reviewing the grievance file and the recommendations made by . . . Dr. Mayo-Smith, [Young] determined that [Mayo-Smith's] recommendations were based on the application of the incorrect portion of policy"; Mayo-Smith used the

wrong VA Handbook provision, the one for Title 5–appointed individuals, which Dr. Hakki was not since he was a Title 38 physician. The Handbook provisions for Title 38 provided that LWOP authorization "is a matter of administrative discretion" and "[a]n employee cannot demand that LWOP be granted," except for FMLA leave or for disabled veterans, which Dr. Hakki did not qualify for. The Handbook for Title 38 employees required an expectation that the employee will return to duty, the needs of the service and patient care not be hampered, and the contribution of the employee merited LWOP. Young determined that the VA "appropriately exercised its discretion to deny LWOP," and the "VA [had] articulated its reason for the denial of LWOP on December 23, 2008"—i.e., the December 2008 LWOP denial—which was based on the lack of certainty as to Dr. Hakki's return and the LWOP request did not establish how the continued leave would serve the VA. Young concluded, "Because the underlying basis for [Mayo-Smith's] recommendations are contrary to applicable VA policy, the recommendations must be rejected. As such, the grievance must be denied."

F. District Court Decision Appealed in this Case

On May 25, 2018, Dr. Hakki filed a new lawsuit in the same federal district court seeking review under the APA of the VA's final decision issued by Young, seeking a writ of mandamus, and alleging due process violations.

15

The parties filed cross-motions for summary judgment. The court granted the VA's motion and denied Dr. Hakki's motion. The court held that it did not have subject-matter jurisdiction to review the APA and mandamus claims because, citing United States v. Fausto, 484 U.S. at 440, 108 S. Ct. at 670, the VBA is a comprehensive statutory scheme and was Dr. Hakki's exclusive remedy and thus barred judicial review of the VA's decision to discharge him.

The court also determined that while it had jurisdiction over constitutional claims under its equitable powers, Dr. Hakki failed to present a colorable due process claim and the undisputed evidence showed he received all the process he was due. In particular, the district court rejected Dr. Hakki's argument that there was a due process violation because Young's decision addressed the wrong grievance—i.e., Dr. Hakki's argument that Hetrick based the denial of his grievance on Dr. Hakki's failure to return on July 1, 2009, while Young's decision was based on his failure to return on January 2, 2009, and his AWOL status thereafter. The district court explained that Dr. Hakki had been on notice that the VA was sustaining his discharge because of a lack of a definite return date and the efficiency of the service. In any event, the logical outgrowth of a determination that the December 2008 LWOP request was properly denied, as Young concluded in rejecting Mayo-Smith's recommendation, was that Dr. Hakki was AWOL from January 2, 2009, through his proposed discharge. Furthermore, though Dr. Hakki

16

argued that he did not have notice that Young would rely on Mayo-Smith's alleged incorrect reference to a particular VA Handbook provision, the district court determined that it did not have the authority to determine an issue related to the correct VA Handbook provision.

The district court also rejected Dr. Hakki's challenge to Young's decision on the basis that Young misinterpreted the standard relating to the expectation of an employee's return to duty—i.e., whether or not a definitive return date is required. The district court rejected that argument as a substantive challenge—not a procedural due process matter—over which the court had no jurisdiction.

Finally, the district court rejected an argument that any bias influenced the decision to terminate Dr. Hakki. Therefore, the district court entered summary judgment for the VA.

Dr. Hakki timely appealed.

## II.    STANDARD OF REVIEW

Although the district court in this case heard and granted a motion for summary judgment, the motion presented a "factual attack" on subject-matter jurisdiction and the district court looked beyond the complaint (i.e., to the administrative record) to determine whether it had subject-matter jurisdiction. Lawrence v. Dunbar, 919 F.2d 1525, 1528–30 (11th Cir. 1990); Stalley ex rel. U.S. v. Orlando Reg'l Healthcare Sys., Inc., 524 F.3d 1229, 1232–33 (11th Cir. 2008).

17

Thus, if a valid attack, dismissal would be appropriate pursuant to Federal Rule of Civil Procedure 12(b)(1), instead of the entry of judgment pursuant to Rule 56(a). See Stalley, 524 F.3d at 1232 ("A dismissal for lack of subject matter jurisdiction is not a judgment on the merits and is entered without prejudice."); Kennedy v. Floridian Hotel, Inc., 998 F.3d 1221, 1230 (11th Cir. 2021) ("Here, Floridian's motion . . . challenged 'the existence of subject matter jurisdiction in fact, irrespective of the pleadings.' The district court reasonably construed Floridian's motion for summary judgment as a factual attack on subject matter jurisdiction under Rule 12(b)(1)." (quoting Lawrence, 919 F.2d at 1529)); see also Fed. R. Civ. P. 12(h)(3). When reviewing a decision regarding a factual attack on subject-matter jurisdiction, we review the district court's legal conclusions de novo and any jurisdictional factual findings for clear error, though the facts are not in dispute in this case. See Kennedy, 998 F.3d at 1233 n.5.

A "factual attack," as opposed to a "facial attack" on the pleadings, means a motion—though it may be labeled as a motion for summary judgment— "challenges the existence of subject matter jurisdiction irrespective of the pleadings, and extrinsic evidence may be considered." Id. at 1230 (citing Lawrence, 919 F.2d at 1529); Morrison v. Amway Corp., 323 F.3d 920, 925 n.5 (11th Cir. 2003) ("Appellees' motion to dismiss was a factual attack because it relied on extrinsic evidence and did not assert lack of subject matter jurisdiction

solely on the basis of the pleadings.").  "A district court evaluating a factual attack on subject matter jurisdiction 'may proceed as it never could' at summary judgment and 'is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case.'"  Kennedy, 998 F.3d at 1230 (citing Lawrence, 919 F.2d at 1529).  Though proceeding like it would in hearing a motion for summary judgment when presented with a valid factual attack, the district court must "construe[] . . . [a] motion for summary judgment as a factual attack on subject matter jurisdiction under Rule 12(b)(1)" because it is without power to enter judgment without jurisdiction and must dismiss the case.  Id.

Furthermore, "courts must consider" questions of subject-matter jurisdiction sua sponte if not raised by the parties.  Fort Bend Cnty. v. Davis, 139 S. Ct. 1843, 1849, 204 L. Ed. 2d 116 (2019); Absolute Activist Value Master Fund Ltd. v. Devine, 998 F.3d 1258, 1264 (11th Cir. 2021) ("'[P]arties cannot waive subject matter jurisdiction,' and we are 'obligated to inquire into subject matter jurisdiction *sua sponte* whenever it may be lacking.'" (first quoting Scarfo v. Ginsberg, 175 F.3d 957, 960 (11th Cir. 1999); then quoting Mitchell v. Maurer, 293 U.S. 237, 244, 55 S. Ct. 162, 165, 79 L. Ed. 338 (1934))).  And "[w]e may affirm the judgment below on any ground supported by the record, regardless of whether it was relied on by the district court."  Statton v. Fla. Fed. Jud. Nominating Comm'n, 959 F.3d 1061, 1065 (11th Cir. 2020).

19

## III.    DISCUSSION

Dr. Hakki appeals the district court's decision holding that the court did not have subject-matter jurisdiction and raises three main issues:  (A) whether the district court had subject-matter jurisdiction over his APA claims, (B) whether the district court had subject-matter jurisdiction over his due process claims for injunctive relief, and (C) whether the district court had mandamus jurisdiction.  For the reasons explained below, we hold that the district court did not have subject-matter jurisdiction over the APA claims because the VBA is a comprehensive statutory remedial scheme that precludes judicial review of the VA's discharge decision; that the district court did not have jurisdiction to hear a constitutional claim because Dr. Hakki did not present a colorable due process claim; and that the district court did not have mandamus jurisdiction because Dr. Hakki established neither a clear right to relief nor a clear duty to act on the part of the VA.

A. The VBA Precludes Judicial Review Pursuant to the APA of the Decision to Discharge Dr. Hakki

Dr. Hakki challenges the substance of the decision to discharge him from employment with the VA under the APA, arguing the decision was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.  The district court held that it did not have jurisdiction over such a claim pursuant to United States v. Fausto.  The Supreme Court held in Fausto that the "deliberate exclusion of employees in [the nonpreference excepted] service category from the

provisions establishing administrative and judicial review for personnel action" in the Civil Service Reform Act ("CSRA")—which "established a comprehensive system for reviewing personnel action taken against federal employees"— "prevent[ed] . . . review in the Claims Court under the Back Pay Act." 484 U.S. at 455, 108 S. Ct. at 677. Relying on the principles of the Fausto holding, our Court has held that the CSRA precludes APA review of certain federal employment decisions, Best v. Adjutant Gen., 400 F.3d 889, 892–93 (11th Cir. 2005) (holding APA review unavailable for terminated nonpreference eligible excepted service employee excluded from express CSRA judicial review provisions); Stephens v. Dep't of Health & Hum. Servs., 901 F.2d 1571, 1576 (11th Cir. 1990) (holding judicial review of personnel decision related to preference-eligible exempt employee foreclosed by CSRA); and "the CSRA precludes a *Bivens* remedy . . . notwithstanding the fact that the CSRA does not provide administrative or judicial review of the adverse personnel action," Lee v. Hughes, 145 F.3d 1272, 1275 (11th Cir. 1998). More to the point of the particular issue here, we have held that the employee disciplinary and grievance procedures applicable to VA employees in the VBA, 38 U.S.C. §§ 7461–64, similarly evidence a congressional intent to preclude certain VA employees from recovering pursuant to a Bivens action for damages. Hardison v. Cohen, 375 F.3d 1262, 1264–66 (11th Cir. 2004). For similar reasons, as explained below, we hold in this case that the same provisions

of the VBA evidence a clear congressional intent to preclude APA judicial review of a VA disciplinary decision made pursuant to 38 U.S.C. § 7463, the provision pursuant to which Dr. Hakki was discharged.

When faced with the question of whether judicial review was available for certain employees under the CSRA, the Fausto Court examined "the purpose of the CSRA, the entirety of its text, and the structure of review that it establishes."  484 U.S. at 444, 108 S. Ct. at 672.  We will do the same for the VBA to determine whether judicial review is available pursuant to § 7463 by outlining the structure of the VBA's comprehensive remedial processes for discipline and review.

1.  The statutory scheme for discipline in the VBA is comprehensive and indicates a clear purpose in its structure for review.

Subchapter V of Title 38 is a comprehensive scheme made up of four statutory sections governing discipline of VA employees, like physicians, appointed pursuant to 38 U.S.C. § 7401(1).[7]  38 U.S.C. § 7461(a).  The first section is 38 U.S.C. § 7461, which provides that adverse charges and actions against VA employees shall go through one of two grievance processes:

> (1) If the case involves or includes a question of professional conduct or competence in which a major adverse action was taken, such an appeal shall be made to a Disciplinary Appeals Board under section 7462 of th[e] title.

---

[7]    Dr. Hakki was a VA employee covered by the provisions of Subchapter V of Title 38 as a physician appointed pursuant to 38 U.S.C. § 7401(1).

22

(2) In any case other than a case described in paragraph (1) that involves or includes a question of professional conduct or competence in which a major adverse action was not taken, such an appeal shall be made through Department grievance procedures under section 7463 of th[e] title.

38 U.S.C. § 7461(b).  A "major adverse action" includes discharge. § 7461(c)(2)(E).  "A question of professional conduct or competence is a question involving" "[d]irect patient care" or "[c]linical competence."  § 7461(c)(3).  A disciplinary action involving both means § 7462 governs; if the action is not "major" or if the action does not involve "a question of professional conduct or competence," § 7463 governs.

Section 7462—the section dealing with major adverse actions involving questions of professional conduct or competence—provides for review by a "Disciplinary Appeals Board" and outlines the specific procedural features of that review, including detailed notice[8] and an opportunity to be heard.[9]  § 7462(a)–(c).

---

[8]    Regarding notice, § 7462(b)(1)(A)—which is incorporated into the minimum procedures due pursuant to § 7463, as stated later in the text of this opinion—states:

Advance written notice from the Under Secretary for Health or other charging official specifically stating the basis for each charge, the adverse actions that could be taken if the charges are sustained, a statement of any specific law, regulation, policy, procedure, practice, or other specific instruction that has been violated with respect to each charge, and a file containing all the evidence in support of each charge, except that the requirement for notification in advance may be waived if there is reasonable cause to believe that the employee has committed a crime for which the employee may be imprisoned.

[9]    Regarding an opportunity to be heard, § 7462(b)(1)(B)—which is also incorporated by § 7463—states:

23

The decision of the Disciplinary Appeals Board is then reviewable by the Secretary, who can reverse, vacate, or accept the decision, as well as order certain remedies like reinstatement or back pay.  § 7462(d).  In addition, an employee "adversely affected by a final order or decision of a Disciplinary Appeals Board (as reviewed by the Secretary) may obtain judicial review of the order or decision." § 7462(f)(1) (emphasis added).  Judicial review and a court's ability to hold unlawful and set aside the VA's decision pursuant to Section 7462, however, is expressly limited:

> In any case in which judicial review is sought under this subsection, the court shall review the record and hold unlawful and set aside any agency action, finding, or conclusion found to be--
>
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> (B) obtained without procedures required by law, rule, or regulation having been followed; or
>
> (C) unsupported by substantial evidence.

§ 7462(f)(2); see Durr v. Shinseki, 638 F.3d 1342, 1346 (11th Cir. 2011) ("Because Durr's complaint seeks judicial review of the decision of a VA Disciplinary Appeals Board, we, like the district court, are limited in our review by

---

The opportunity, within the time period provided for in paragraph (4)(A), to present an answer orally and in writing to the Under Secretary for Health or other deciding official, who shall be an official higher in rank than the charging official, and to submit affidavits and other documentary evidence in support of the answer.

24

38 U.S.C. § 7462(f).").  Thus, though judicial review is afforded to a VA decision made pursuant to § 7462, the section expressly limits that review to certain categories of error or bases for reversal.  Relatedly, the last section of the four sections of Subchapter V—i.e., § 7464—describes the function and role of the Disciplinary Appeals Board.

The remaining of the four sections governing VA employee discipline is § 7463, which expressly governs the procedures for those whose discipline did not involve a major adverse action or did not arise from a question of professional conduct or competence.  This section is significantly limited compared to § 7462.  Section 7463(a) states that "[t]he Secretary shall prescribe by regulation procedures for the consideration of grievances of section 7401(1) employees arising from adverse personnel actions in which each action taken either . . . is not a major adverse action; or . . . does not arise out of a question of professional conduct or competence."  § 7463(a)(1)–(2).  It proceeds to explicitly state that "Disciplinary Appeals Boards shall not have jurisdiction to review such matters, other than as part of a mixed case (as defined in section 7462(a)(3) of this title)." § 7463(a).  "[A] mixed case is a case that includes both a major adverse action arising out of a question of professional conduct or competence and an adverse action which is not a major adverse action or which does not arise out of a question of professional conduct or competence."  § 7462(a)(3).  That is, if the action at

25

issue does not include anything major or if the action at issue does not include anything arising out of a question of professional conduct or competence, then review by a Disciplinary Appeals Board is foreclosed.

Section 7463(b) gives the option to "an employee who is a member of a collective bargaining unit" to "seek review of an adverse action described in subsection (a) either under the grievance procedures provided through regulations prescribed under subsection (a) or through grievance procedures determined through collective bargaining, but not under both."

For those employees against whom charges have been brought that may result in a major adverse action but do not involve professional conduct or competence, certain procedural protections are due.  § 7463(c)(1).  In other words, employees governed by § 7463—because their case did not involve a question of professional conduct or competence—are distinguished, in any event, if their discipline may still be considered a "major adverse action." Id.  "[T]he employee is entitled to notice and an opportunity to answer with respect to those charges in accordance with subparagraphs (A) and (B) of section 7462(b)(1)," i.e., the notice and opportunity afforded to employees with charges involving a question of professional conduct or competence that also may result in a major adverse action

under § 7462.[10]  See § 7463(c)(1); supra notes 9 & 10.  "In any other case," less robust notice and opportunity to be heard are afforded.  § 7463(c)(2).[11]

Section 7463 also sets minimum requirements for procedures prescribed by the Secretary of the VA.  Those minimum requirements are:

> (1) A right to formal review by an impartial examiner within the Department of Veterans Affairs, who, in the case of an adverse action arising from a question of professional conduct or competence, shall be selected from the panel designated under section 7464 of th[e] title.
>
> (2) A right to a prompt report of the findings and recommendations by the impartial examiner.
>
> (3) A right to a prompt review of the examiner's findings and recommendations by an official of a higher level than the official who decided upon the action.  That official may accept, modify, or reject the examiner's recommendations.

§ 7463(d).  Finally, "the employee is entitled to be represented by an attorney or other representative of the employee's choice at all stages of the case" in the grievance procedures prescribed by the Secretary.  § 7463(e).  Otherwise, § 7463 is silent on any other issues.

---

[10]    Section 7462(c)(3) sets different time periods than those in § 7463(b)(4)–(5) for the notice and opportunity to be heard for § 7462 cases.

[11]    In particular, for charges not implicating either a major adverse action or a question of professional conduct or competence, the employee is entitled to "(A) written notice stating the specific reason for the proposed action, and (B) time to answer orally and in writing and to furnish affidavits and other documentary evidence in support of the answer."  § 7463(c)(2).

2. The statutory disciplinary scheme in the VBA, 38 U.S.C. §§ 7461–64, forecloses judicial review pursuant to the APA of a decision of the VA made pursuant to § 7463.

With this entire statutory structure in mind, we conclude that § 7463's silence regarding judicial review and its limitation of when Disciplinary Appeals Board review is available "displays a clear congressional intent to deny the excluded employees the protections of [§ 7462]—including judicial review—for personnel action covered by [§ 7463]." See Fausto, 484 U.S. at 447, 108 S. Ct. at 673. Therefore, a district court does not have subject-matter jurisdiction over an APA claim to review a § 7463 decision.

First, § 7463 is silent with respect to judicial review. This silence compares with the other section of the VBA that affords more procedures in certain circumstances—i.e., § 7462, dealing with major adverse actions involving questions of professional conduct or competence—which expressly provides for judicial review of a Disciplinary Appeals Board order or decision for an employee that is "adversely affected by a final order or decision of a Disciplinary Appeals Board (as reviewed by the Secretary)." § 7462(f)(1).

Second, this silence regarding judicial review is coupled with the limited circumstances under which an employee disciplined pursuant to § 7463 may seek Disciplinary Appeals Board review: "Disciplinary Appeals Boards shall not have jurisdiction to review such matters, other than as part of a mixed case . . . ."

28

§ 7463(a). In other words, where the case does not involve a major adverse action arising out of a question of professional conduct or competence—i.e., one that cannot be a mixed case—Disciplinary Appeals Board review is unavailable. Review by a Disciplinary Appeals Board is the first step in obtaining judicial review under § 7462; allowing for judicial review of a decision made pursuant to § 7463 (i.e., not in a mixed case) without that first step of Disciplinary Appeals Board review would up-end the carefully outlined procedures for discipline and the funneling of review of decisions through particular procedures and steps. An employee cannot skip from the decision imposing the adverse action to judicial review in a federal court under either § 7462 or § 7463; an employee disciplined pursuant to § 7462 must go through Disciplinary Appeals Board review and then to review by the Secretary before judicial review is possible. Cf. Fausto, 484 U.S. at 449–50, 108 S. Ct. at 674–75 ("Interpreting the exclusion of nonpreference excepted service personnel from Chapter 75 as leaving them free to pursue other avenues of review would turn the first structural element upside down . . . . Under respondent's view, he would be able to obtain judicial review of a 10–day suspension for misconduct, even though a competitive service employee would not . . . ."). Section 7463, with its express limitation on the circumstances in which Disciplinary Appeals Board review is available, clearly prohibits judicial review of a decision made pursuant to its procedures.

29

Furthermore, the APA—that is, the statute that Dr. Hakki asserts provides a basis for judicial review of the VA's decision to discharge him—provides, in part, that a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be":

> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> (B) contrary to constitutional right, power, privilege, or immunity;
>
> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
>
> (D) without observance of procedure required by law;
>
> (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
>
> (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

5 U.S.C. § 706(2). Section 7462 of the VBA clearly expresses the limited circumstances under which a reviewing court can set aside a decision by the Secretary and "hold unlawful and set aside any agency action, finding, or conclusion": when the action, findings, or conclusions are

> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> (B) obtained without procedures required by law, rule, or regulation having been followed; or
>
> (C) unsupported by substantial evidence.

30

§ 7462(f)(2). It does not make any common sense that an employee disciplined pursuant to § 7463—who cannot seek the judicial review granted pursuant to § 7462 and thus cannot have his discipline set aside for the reasons outlined in § 7462(f)(2)—can proceed using the APA instead. The bases for APA review overlap with § 7462. Allowing for APA review for § 7463 discipline would "turn" the VBA's disciplinary structure of review "upside down." See Fausto, 484 U.S. at 449, 108 S. Ct. at 674.

The First and Sixth Circuits have similarly examined the VBA and held that APA review is precluded pursuant to § 7463. In a case in which a VA physician asserted an APA claim, the First Circuit held that "Congress's express provision of judicial review in § 7462, coupled with a complete omission of judicial review in § 7463—the provision governing [the physician]—is 'persuasive evidence that Congress deliberately intended to foreclose further review of such claims.'" Pathak v. Dep't of Veterans Affs., 274 F.3d 28, 32 (1st Cir. 2001) (quoting United States v. Erika, Inc., 456 U.S. 201, 208, 102 S. Ct. 1650, 72 L. Ed. 2d 12 (1982)) (citing Fausto, 484 U.S. at 448, 108 S. Ct. 668). The Sixth Circuit also held that a physician was "precluded from invoking the protections of the APA to obtain the judicial review of her adverse employment action that she was denied by the Veterans' Benefits Act" because "[l]ike the CSRA, Title 38 provides a comprehensive regulatory scheme for employees of the VA," and "[i]n particular,

31

§ 7463 outlines the procedures Congress intended to provide for review of adverse actions of the type [the physician] encountered." Fligiel v. Samson, 440 F.3d 747, 752 (6th Cir. 2006).[12]  We join the First and Sixth Circuits in holding that the VBA precludes APA review of a VA decision regarding employee discipline made pursuant to 38 U.S.C. § 7463.

    3.  As a VA employee discharged pursuant to 38 U.S.C. § 7463, Dr. Hakki cannot obtain judicial review of the discharge decision pursuant to the APA.

In this case, Dr. Hakki seeks review of the decision to discharge him pursuant to the APA.  He was disciplined for something not involving professional

---

[12]    Dr. Hakki's only attempt at distinguishing these holdings is to argue that they did not involve the more serious harm suffered by Dr. Hakki—i.e., discharge—and that courts, including the former Fifth Circuit, have held that a discharged VA employee has a right to judicial review. See Opening Br. at 25; see also Reply Br. at 13–14.  But as the district court observed, the case law Dr. Hakki cites in support largely pre-dates Fausto and the governing procedures in those cases pre-dated the statutory structure currently governing VA employee disciplinary review, codified at 38 U.S.C. §§ 7461–64, enacted in 1991.  See Department of Veterans Affairs Health–Care Personnel Act of 1991, Pub. L. No. 102–40, sec. 203, 105 Stat. 187, 202–08.  Before 1991, the statutory provisions governing discipline simply provided for review by "disciplinary boards" for "charges of inaptitude, inefficiency, or misconduct of any person employed in a position provided in paragraph (1) of section 4104." See 38 U.S.C. § 4110(a) (1990).  A disciplinary board's recommendation would then be reviewable by the Administrator of the then-named Veterans Administration (before it became the VA and a cabinet-level department in 1988), and the statute provided that "[t]he decision of the Administrator shall be final." Id. § 4110(d).  An employee could appeal the final decision of the Administrator under the APA. See Heaney v. U.S. Veterans Admin., 756 F.2d 1215, 1219 (5th Cir. 1985).  The 1991 amendments substantially changed the disciplinary system, which, as explained above, indicates a clear congressional intent to limit both board and judicial review.  None of the cases Dr. Hakki cites addressed the post-1991 structure of disciplinary review. See Gilbert v. Johnson, 601 F.2d 761, 762 (5th Cir. 1979); Heaney, 756 F.2d at 1217; Moore v. Custis, 736 F.2d 1260 (8th Cir. 1984); Franks v. Nimmo, 796 F.2d 1230, 1240 (10th Cir. 1986); Giordano v. Roudebush, 617 F.2d 511, 517 (8th Cir. 1980); Berry v. Hollander, 925 F.2d 311, 315 (9th Cir. 1991).  Therefore, these cases do not change our conclusion outlined above.

32

conduct or competence. Though a major adverse action was implicated, because his discharge did not involve a question of professional conduct or competence, his discipline was governed by § 7463. His case was not mixed. Thus, nowhere in § 7463 is Dr. Hakki afforded a right to Disciplinary Appeals Board review or judicial review. By prescribing and limiting the review available for Dr. Hakki's discharge in § 7463, Congress indicated an intent to preclude judicial review in his case. Therefore, Dr. Hakki cannot circumvent those procedures authorized by § 7463 and use the APA to seek judicial review of his discharge. Such review is barred.

Although our decision in Hardison held that the comprehensive remedial processes afforded by the VBA for VA employees precluded a Bivens claim for damages, whereas the issue in our case is whether those remedial processes preclude judicial review under the APA, we think Hardison provides support for our conclusion that judicial review under the APA is also precluded. "It would thwart the will of Congress," Hardison, 375 F.3d at 1265, to allow APA judicial review for Dr. Hakki, when the VBA comprehensive remedial procedures allow judicial review only for more protected VA employees—i.e., those whose major disciplinary action involved professional conduct or competence. Accordingly, we hold that Dr. Hakki cannot use the APA to obtain judicial review to challenge the merits of his discharge. For the foregoing reasons, we conclude that the district

33

court was correct in holding that it did not have subject-matter jurisdiction to hear Dr. Hakki's claims for review of the decision to discharge him from employment with the VA pursuant to the APA.

B. The District Court Did Not Have Jurisdiction to Hear a Constitutional Claim Because Dr. Hakki Did Not Present a Colorable Due Process Claim

Dr. Hakki asserts that, even assuming no APA review, the district court had jurisdiction to adjudicate his alleged violations of his constitutional procedural due process rights to notice and an opportunity to be heard in his discharge proceedings. From our best reading of his briefing, Dr. Hakki presents two bases for an alleged procedural due process claim.[13] First, he asserts that he had no notice or opportunity to be heard on the issue of his discharge being based on the December 2008 LWOP denial. Second, Dr. Hakki asserts that he had no notice or opportunity to be heard on his discharge being based on a particular VA Handbook provision regarding the degree of certainty for a proposed return date.

___

[13] While Dr. Hakki repeatedly refers to violations of his due process rights in terms of administrative procedure, violations of VA rules and regulations, and arbitrary and capricious agency action, Opening Br. at 6, 11, 26–28, Reply Br. at 6–12, when an agency fails to follow its own rules or regulations, the case law is clear that a due process claim does not automatically arise. The question remains whether "[t]he root requirements of due process were . . . met," i.e., "that one be given notice and an opportunity to be heard." Am. C.L. Union of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd., 557 F.3d 1177, 1229, 1230 (11th Cir. 2009); Smith v. State of Ga., 684 F.2d 729, 733 n.6 (11th Cir. 1982) ("We disagree . . . that every deviation by a state or federal agency from its own rules constitutes a constitutional violation."); see also Garrett v. Mathews, 625 F.2d 658, 660 (5th Cir. 1980) ("[N]ot every violation by an agency of rules rises to the level of a due process claim."). Therefore, having not established that he was deprived of the constitutional minima, as explained in this opinion, his tying the purported due process violations to administrative requirements fails to support a colorable due process claim.

34

Noting that our Court has left open the possibility that equitable relief to address an alleged violation of the Constitution may be available despite a comprehensive statutory scheme's preclusion of other judicial review, the district court determined that Dr. Hakki had not stated a claim for a constitutional due process violation and thus the court's jurisdiction could not be invoked.  As explained below, because Dr. Hakki has not presented a colorable due process claim, the district court was correct that it did not have subject-matter jurisdiction on the basis of Dr. Hakki's assertions of due process violations.[14]

---

14    We need not and do not answer the question of whether the VBA precludes all colorable constitutional claims, like it does the APA claims in this case, because, as we explain, Dr. Hakki has not demonstrated even a colorable due process claim.  In other words, without a colorable claim, no jurisdiction to hear a constitutional claim for injunctive relief exists, regardless of whether the VBA is a complete bar and thus there is no need to reach the VBA-based issue.  See Pathak, 274 F.3d at 33 ("We conclude that Pathak's constitutional claim is not even colorable, and so we find it unnecessary to reach Pathak's claim that we have jurisdiction over his constitutional claim notwithstanding our lack of jurisdiction over his statutory claims."); cf. Fligiel, 440 F.3d at 754 ("On appeal, Fligiel challenged the denial of *statutory* due process. Therefore, we do not reach the issue of whether the preclusion of review extends to due process claims based on the United States Constitution.").  We faced a similar question in Hardison, noting that "[t]he Supreme Court has not addressed directly the issue whether a remedial statutory scheme necessarily precludes an action for equitable relief brought by a federal employee," that our sister circuits have reached diverging conclusions, and that "[a]lthough this Court has not squarely addressed that question, two of our precedents can be read to support either of the possible answers."  375 F.3d at 1266 (citing Perry v. Thomas, 849 F.2d 484, 484–85 (11th Cir. 1988); Stephens, 901 F.2d at 1576).  In Hardison, 375 F.3d at 1268, we declined to decide whether the VBA's comprehensive remedial scheme foreclosed equitable remedies for violations of constitutional due process because Hardison could establish no protected property interest—i.e., because he had no colorable due process claim.  We follow Hardison's path; because Dr. Hakki has failed to present even a colorable claim, we need not decide whether the VBA remedial scheme—38 U.S.C. §§ 7461–64—would altogether foreclose equitable relief even for a colorable procedural due process claim.

35

1.  Equitable constitutional jurisdiction could only extend to a <u>colorable</u> constitutional due process claim for injunctive relief.

The requirement that a plaintiff raise a colorable constitutional claim is a part of our inquiry into whether the district court had federal-question jurisdiction. "The basic statutory grants of federal-court subject-matter jurisdiction are contained in 28 U.S.C. §§ 1331 and 1332.  Section 1331 provides for '[f]ederal-question' jurisdiction . . . .  A plaintiff properly invokes § 1331 jurisdiction when she pleads a colorable claim 'arising under' the Constitution or laws of the United States."  <u>Arbaugh v. Y&H Corp.</u>, 546 U.S. 500, 513, 126 S. Ct. 1235, 1244, 163 L. Ed. 2d 1097 (2006).

"A claim invoking federal-question jurisdiction under 28 U.S.C. § 1331, . . . may be dismissed for want of subject-matter jurisdiction if it is not colorable, *i.e.*, if it is 'immaterial and made solely for the purpose of obtaining jurisdiction' or is 'wholly insubstantial and frivolous.'"  <u>Id.</u> at 513 n.10, 126 S. Ct. at 1244 n.10 (quoting <u>Bell</u>, 327 U.S. at 682–83, 66 S. Ct. 773) (citing <u>Steel Co. v. Citizens for Better Env't</u>, 523 U.S. 83, 89, 118 S. Ct. 1003, 1010, 140 L. Ed. 2d 210 (1998)).  That is, "[d]ismissal for lack of subject-matter jurisdiction because of the inadequacy of the federal claim is proper only when the claim is 'so insubstantial, implausible, foreclosed by prior decisions of th[e] [Supreme] Court, or otherwise completely devoid of merit as not to involve a federal controversy.'"  <u>Steel Co.</u>, 523 U.S. at 89, 118 S. Ct. at 1010 (quoting <u>Oneida Indian Nation of N.Y. v.</u>

36

County of Oneida, 414 U.S. 661, 666, 94 S. Ct. 772, 777, 39 L.Ed.2d 73 (1974)). "For a constitutional claim to be colorable, 'the alleged violation need not be substantial, but the claim must have some possible validity.'" Arias v. U.S. Att'y Gen., 482 F.3d 1281, 1284 n.2 (11th Cir. 2007) (quoting Mehilli v. Gonzales, 433 F.3d 86, 93–94 (1st Cir. 2005)).

In this case, the only constitutional claims proffered are procedural due process claims. "The 'essential requirements of due process' are notice and a pre-termination opportunity to respond." Laskar v. Peterson, 771 F.3d 1291, 1297 (11th Cir. 2014) (quoting Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 546, 105 S. Ct. 1487, 1495, 84 L. Ed. 2d 494 (1985)). "[D]ue process . . . requires notice 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" United Student Aid Funds, Inc. v. Espinosa, 559 U.S. 260, 261, 130 S. Ct. 1367, 1372, 176 L. Ed. 2d 158 (2010) (quoting Mullane v. Cent. Hanover Bank & Tr. Co., 339 U.S. 306, 314, 70 S. Ct. 652, 94 L. Ed. 865 (1950)). And one must be afforded "the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" Mathews v. Eldridge, 424 U.S. 319, 333, 96 S. Ct. 893, 902, 47 L. Ed. 2d 18 (1976) (citation omitted)). "While some pre-termination hearing is necessary" in the public employment context, "it need not be elaborate." Laskar, 771 F.3d at 1297 (citing Loudermill, 407 U.S. at 545, 105 S. Ct. at 1495).

37

2. Neither of Dr. Hakki's purported theories of a due process violation supports a colorable constitutional claim.

Dr. Hakki presents no colorable due process claim. His two theories are devoid of any merit and do not establish subject-matter jurisdiction. We address each in turn.

a. *Dr. Hakki presents no colorable due process claim in his argument that Young incorrectly relied upon the December 2008 LWOP denial in making the final decision to discharge him.*

First, Dr. Hakki asserts that he had no notice or opportunity to be heard on the issue of his discharge being based on the denial of LWOP in December 2008 and the related issue of whether he was discharged for not appearing for work on January 2, or July 1, 2009. That is, Dr. Hakki argues he filed a grievance related to his discharge in November 2009, i.e., the decision of Hetrick, removing him from Bay Pines and did not grieve the December 2008 LWOP denial. Dr. Hakki suggests that Hetrick discharged him for failing to return to work on July 1, 2009, not for failing to return to work on January 2, 2009. But, his argument proceeds, Young upheld the discharge decision on the basis that he failed to return on January 2, 2009, and was AWOL thereafter. Thus, argues Dr. Hakki, Young's final decision to sustain his discharge was not based on conduct for which Dr. Hakki was on notice. But this argument is just plain wrong on the facts, as made absolutely clear by an overwhelming amount of evidence of notice to Dr. Hakki. Accordingly, Dr. Hakki fails to present a colorable due process claim. That

38

overwhelming evidence indicates that Dr. Hakki knew that the VA's position was that Dr. Hakki must report to duty as of January 2, 2009, and knew that his request for LWOP beyond that date was denied in December 2008, meaning his date of return continued to be January 2, 2009, and meaning that he was AWOL thereafter.

As an initial matter, before January 2, 2009, Dr. Hakki had been notified that he must return by that date—i.e., January 2, 2009—four separate times:  on September 26, October 28, November 3, and December 23, 2008.  Thus, Dr. Hakki was on notice that he had to return to work on January 2, 2009.

After he did not return on that solidified date of January 2, 2009, Dr. Hakki was provided notice of the importance of the December 2008 LWOP request and its denial.  In the proposed discharge, i.e., the document initiating the process of Dr. Hakki's discharge, Dr. Wright, the Chief of the Surgical Service, expressly stated that Dr. Hakki had been approved for LWOP through December 31, 2008— which, in other words, meant his return date was January 2, 2009—and a "request for an extension of LWOP was subsequently denied in a letter dated December 23, 2008."  The proposed discharge proceeded to explain that Dr. Hakki did not return as of the required date (January 2, 2009), which remained the date to return because the December 2008 LWOP request was not granted.  Thus, this proposed discharge explained that having failed to secure an extension of LWOP, the VA required Dr. Hakki to return to work on January 2, 2009.  And when Dr. Hakki did

not return to work on January 2, 2009, as the proposed discharge explained, he was charged AWOL for 26 weeks and that continued unauthorized absence would not serve the VA's mission or the efficiency of the service. Clearly, the proposed discharge gave Dr. Hakki notice of the relevance to the discharge proceedings being brought against him of the December 2008 LWOP request and denial and of the January 2, 2009 return date. This notice clearly satisfies the constitutional minimum. But the evidence does not stop there.

Shortly thereafter, on July 21, 2009, Dr. Hakki acknowledged the relevance of the December 2008 LWOP request when he sent the VA a response to the proposed discharge, which (a) expressly incorporated by reference his December 2008 LWOP request and the reasons explained in that request as to why he should be given extended LWOP status, and (b) acknowledged that "[t]he period of . . . purported AWOL upon which the proposed discharge is based is, of course, the very time period for which [he] previously sought leave without pay ('LWOP') by a request dated December 19, 2008. Mr. Hopkins denied that request for LWOP as well as a subsequent grievance of that denial." Therefore, Dr. Hakki confirmed that he had notice of the relevance and importance of the decision to deny the December 2008 LWOP request.

Then, on November 13, 2009, Hetrick issued a decision sustaining Dr. Hakki's discharge, which notified him of the importance of the January 2, 2009

40

return date and the denial of the "additional request for LWOP (e.g. January 2009 - July 2009)," i.e., the December 2008 LWOP request. Hetrick's decision stated, "You did acknowledge that you thought you would be able to '*return*' to the VA in January of 2009." Then, Hetrick explicitly stated, "Careful consideration was also given to the frequency of your conduct. Specifically, since January 2, 2009, you have been charged absent without leave (AWOL) for 26 weeks."

Dr. Hakki urges on appeal that Hetrick based his discharge decision on Dr. Hakki's failure to return to work on July 1, 2009. Dr. Hakki is simply wrong. Hetrick referenced the arbitration settlement proposal and the July 1, 2009 date only in response to Dr. Hakki's assertion that the "purported settlement agreement [established] that Dr. Hakky did not have to return to Bay Pines until July 1, 2009 (as opposed to January 2, 2009 as charged in the proposed discharge) and that he would be considered AWOL during that six month period. While Dr. Hakky did not return on July 1, 2009, the proposed discharge is not based on that." Responding to that assertion, Hetrick wrote:

> However, a careful review of the settlement agreement reveals that in order for you to be designated as "*Absent without Leave*," you were required to report to duty by July 1, 2009. By your own admission, you failed to return to duty by the established deadline. This aforementioned failure therefore, supports the charge as set forth in the Notice of Proposed Removal.

It is clear from Hetrick's November 13, 2009 letter that—contrary to Dr. Hakki's argument on appeal—Hetrick, in sustaining the proposed discharge, did not rely on

41

the failure to return on July 1, 2009. As noted above, Hetrick commented on the July 1, 2009 date only in response to an assertion by Dr. Hakki. And, as noted in the above quotation, he relied on it only because it "supports the charge as set forth in the Notice of Proposed Removal." That is, Dr. Hakki's failure to report even on the later, July 1, 2009 date supports the proposed reason to discharge Dr. Hakki—his failure to report on the actual return date of January 2, 2009. The failure to report even on the later, July 1, 2009 date, supports the willfulness of Dr. Hakki's failure to report on January 2, 2009. Hetrick also found willfulness. Moreover, considering Hetrick's November 13, 2009 letter as a whole, it is clear that his reference to the July 1, 2009 date was a mere response to one of Dr. Hakki's assertions (all of such responses appear in paragraph 1 of Hetrick's letter). By contrast, paragraph 2 of Hetrick's letter is introduced, "In making the decision to remove you from employment," and then lists Hetrick's reasons for his decision, foremost among them being: "Careful consideration was also given to the frequency of your conduct. Specifically, since January 2, 2009, you have been charged Absence without Leave (AWOL) for twenty-six (26) weeks." Thus, Dr. Hakki is simply wrong in thinking that Hetrick relied on his failure to return on July 1, 2009, to the exclusion of the failure to return on January 2, 2009, and his AWOL status thereafter.

42

In any event, with respect to notice and opportunity to be heard, it is absolutely clear that Dr. Hakki had notice that the VA's reasons for discharging him were based upon his failure to appear for work and his AWOL status, which obviously included the failure to appear on January 2, 2009, as well as his continued failure to appear any time thereafter, including on July 1, 2009.

After this decision by Hetrick, and after Dr. Hakki's grievance of his discharge had been denied, the Hakki I court remanded the grievance of Dr. Hakki's discharge back to the VA. At that point, Dr. Hakki had still another opportunity, with the appropriate notice, to present his arguments regarding the relevant conduct to Mayo-Smith, who would recommend a decision to Young as final decisionmaker. Despite claiming ignorance in his appellate briefing, Dr. Hakki acknowledged in his brief filed with Mayo-Smith in November 2018 "that the proposed discharge was based upon a purported alleged failure to return to Bay Pines on January 2, 2009 and being AWOL thereafter through June 2009." Thus, as of the second set of procedures—i.e., the ones that led to the decision on appeal in this case now—it is overwhelmingly clear that Dr. Hakki had notice of the issues related to his January 2, 2009 return date and the denial of his December 2008 request to extend that date, and notice of the significance of his AWOL status.

43

And of course, Young's final decision ruled against Dr. Hakki on the basis of this issue of which Dr. Hakki had such overwhelming notice and opportunity to be heard—i.e., his failure to return on January 2, 2009, his AWOL status thereafter, and the continuing uncertainty as to when Dr. Hakki would return. Young's final decision to reject Dr. Hakki's grievance regarding his discharge stated that the recommendations of Mayo-Smith must be rejected and thus the grievance denied as well. Young specifically explained that the "VA articulated its reasons for the denial of LWOP on December 23, 2008," and that "was based upon the lack of certainty as to Dr. Hakki's return and the LWOP request did not establish how the grant would serve the interests of the Agency." Young continued, "Because the underlying basis for [Mayo-Smith's] recommendations are contrary to applicable VA policy, the recommendations must be rejected. As such, the grievance must be denied." Thus, the final decision issued by Young concluded that the December 2008 LWOP denial was proper. And the denial of the December 2008 LWOP request, of course, meant that Dr. Hakki was required to report on January 2, 2009, and resulted in his being AWOL thereafter.

A common-sense view of this issue also requires acknowledging, at each step of the way, that the denial of LWOP is inherently and inextricably intertwined with the basis for the immediate precursor to Dr. Hakki's proposed discharge, i.e., his AWOL status, and thus is a reason for his discharge. Because he had been

44

denied an LWOP extension in December 2008, Dr. Hakki was required to return to work on January 2, 2009—as he had repeatedly been told—and he did not do so, so he was AWOL for some time, leading to his proposed discharge. Dr. Hakki was repeatedly, ad nauseam, notified of the import of the December 2008 LWOP request and denial and the fact that it necessarily meant that January 2, 2009, would be the date for Dr. Hakki to return to work or be considered AWOL. It is illogical to separate these issues out.

There is absolutely no merit to the argument that Dr. Hakki had been deprived of notice that he would be discharged for failing to return to duty on January 2, 2009, and his failure to obtain extended LWOP in December 2008, and his resulting AWOL status. Thus, no colorable due process claim arises for which the district court could exercise jurisdiction.

> b. *Dr. Hakki's claim that he was not notified that his discharge would be based on a particular VA Handbook provision regarding the certainty of his return date fails to support a colorable due process claim.*

Dr. Hakki's second theory is as meritless as his first. He argues that his due process rights were violated because Young's final decision relied upon a provision of the VA handbook of which Dr. Hakki had no notice or opportunity to defend against. The provision relied upon by Young related to Title 38 employees, while the provision relied upon by Mayo-Smith related to Title 5 employees. Dr. Hakki's argument suggests that the substance of the requirement in the Handbook

45

requires only that there be an expectation of a return to work, without any requirement of a definitive time to return to work. This argument is a substantive argument, and not a due process argument, and therefore any such substantive argument is one with respect to which the district court has no jurisdiction. See supra Section III.A. In other words, the proper interpretation of the Handbook—whether it required some certainty with respect to an employee's return-to-duty date or whether it merely required an indefinite intent to return as Dr. Hakki urges—is a substantive issue over which the district court has no jurisdiction.[15]

The only possible due process argument (i.e., a theory that could possibly support jurisdiction) to gather from Dr. Hakki's averments is that without knowing the precise provision of the VA Handbook that he was being accused of violating, he had no opportunity to be heard with respect to a violation thereof. To the extent this is Dr. Hakki's argument, it is wholly without merit. It was apparent all through the proceedings that the VA's position was that Dr. Hakki's December 2008 LWOP request was denied in large part because he was unable or unwilling to provide a date certain that he could return to work. The VA gave Dr. Hakki ample notice and opportunity to challenge that position.

---

[15]     Incidentally, Dr. Hakki acknowledges on appeal that Young, not Mayo-Smith, identified the appropriate provision of the Handbook.

There is overwhelming evidence of this notice.  That overwhelming evidence includes the December 23 denial of the December 2008 LWOP request by Hopkins, the Bay Pines Hospital Director, who expressly explained that one reason for the denial was that VA Handbook 5011 required "certainty" with respect to a return date and Dr. Hakki had failed to provide certainty.  In addition, Hopkins denied Dr. Hakki's union grievance on January 28, 2009, again noting "there is no way to definitively determine the actual date his personal affairs will be resolved."  Finally, Hetrick's decision to reject the grievance to the proposed discharge on November 13, 2009, noted that Dr. Hakki was still "uncertain when he could return to the duties and responsibilities of [his] position," and thus any alternative form of discipline could not compel Dr. Hakki's regular attendance.

Acknowledging this notice, Dr. Hakki wrote in his brief to Mayo-Smith that VA witnesses at his hearing repeated a "mantra" that "the Agency did not have a definitive date they could rely upon for Dr. Hakki's return."  This demonstrates both that Dr. Hakki was on notice of the VA's reliance on the lack of certainty in Dr. Hakki's return as a basis for his discharge and that Dr. Hakki's position on this issue was heard by Mayo-Smith.

In the face of this overwhelming evidence, Dr. Hakki attempts to simply frame the issue in terms of "a citation error," but such a framing misses the point entirely.  Dr. Hakki knew that the certainty of his return date would be a reason for

47

his discharge. Whether the proper standard was applied, or the proper citation included, in any decision is a substantive question that, of course, is not a procedural due process issue and not within the jurisdiction of the district court. Indeed, it seems Dr. Hakki disagrees about whether or not his letters to the VA included a "certain" date; again, such a disagreement is a substantive matter—not a procedural due process issue—that the district court properly avoided deciding.

Therefore, Dr. Hakki has not presented even a colorable due process claim, and the district court correctly determined that it was without federal subject-matter jurisdiction over any such claim.

C. There Is No Basis for Mandamus Jurisdiction Because Dr. Hakki Has Not Established a Clear Right to Any Relief or a Clear Duty of the VA

The last basis for subject-matter jurisdiction asserted by Dr. Hakki is mandamus jurisdiction. The Mandamus Act provides as follows: "The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361. "[M]andamus is an extraordinary remedy which should be utilized only in the clearest and most compelling of cases." Cash v. Barnhart, 327 F.3d 1252, 1257 (11th Cir. 2003) (quoting Carter v. Seamans, 411 F.2d 767, 773 (5th Cir. 1969)). "[T]he test for mandamus jurisdiction is 'whether mandamus would be an appropriate means of relief.'" United States v. Salmona, 810 F.3d 806, 811 (11th Cir. 2016) (quoting

48

Cash, 327 F.3d at 1258).  Mandamus jurisdiction may be exercised "only if (1) the plaintiff has a clear right to the relief requested; (2) the defendant has a clear duty to act; and (3) no other adequate remedy is available."  Serrano v. U.S. Att'y Gen., 655 F.3d 1260, 1263 (11th Cir. 2011) (citing Cash, 327 F.3d at 1258).  "The party seeking mandamus has the burden of demonstrating that his right to the writ is clear and indisputable."  Id. at 1260, 1263–64 (11th Cir. 2011) (citing In re BellSouth Corp., 334 F.3d 941, 953 (11th Cir. 2003)).  "Put another way, a writ of mandamus 'is intended to provide a remedy for a plaintiff only if he has exhausted all other avenues of relief and only if the defendant owes him a clear nondiscretionary duty.'"  Cash, 327 F.3d at 1258 (quoting Heckler v. Ringer, 466 U.S. 602, 616, 104 S. Ct. 2013, 80 L. Ed. 2d 622 (1984)).

    Dr. Hakki has not established the requirements for mandamus jurisdiction. He has wholly failed to establish a clear right to any relief or a clear duty on the part of the VA.  To the extent that he reiterates his procedural due process arguments, we have already held that those are wholly without merit.  See supra Section III.B.  He also mentions in conclusory fashion that the VA failed to follow its own rules and regulations and that he was entitled to have someone other than a former Deputy Network Director from VISN 8—i.e., someone other than Young— as the final decisionmaker for his case.  However, to the extent that he intends to present some rule violation separate from and independent of his meritless due

49

process arguments, Dr. Hakki fails to identify any rule that was allegedly violated that might entitle him to mandamus relief; therefore, any such argument fails.

And while he mentions that he is owed a right to have someone other than Young be the final decisionmaker for his case, Dr. Hakki has presented no theory whatsoever for why he has such a right. In fact, Dr. Hakki presents no argument to challenge the district court's conclusion that no due process violation arose from any of Dr. Hakki's allegations of bias as a result of Young's past association with VISN 8. Nor does he challenge the district court's conclusion that the record shows that only some individuals were recused from VISN 8, not the entire network and not Young. Therefore, Dr. Hakki has waived any argument in this regard. See Sapuppo v. Allstate Floridian Ins. Co., 739 F.3d 678, 681 (11th Cir. 2014) ("We have long held that an appellant abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority.").[16]

---

[16]     On a related note, Dr. Hakki vaguely refers (in a two-sentence paragraph in his "Statement of the Case" section) to "*ex parte* communications concerning the matter between Bay Pines or VISN 8" and states they are prohibited by the VA Handbook with a citation to the Handbook and a case regarding due process. Opening Br. at 6. Dr. Hakki makes no argument at all regarding this assertion and therefore it is deemed abandoned. See Kelliher v. Veneman, 313 F.3d 1270, 1274 (11th Cir. 2002) ("Kelliher only mentioned his EEOC retaliation claim in the summary of the argument in his initial brief. Because Kelliher made no arguments on the merits as to this issue, the issue is deemed waived.").

Having failed to establish any clear right to any relief or a clear duty to act on behalf of the VA, Dr. Hakki has not established mandamus jurisdiction.[17]

## IV. CONCLUSION

For the reasons stated above, the district court was without subject-matter jurisdiction to hear any of Dr. Hakki's claims. Because there was no jurisdiction, however, the district court should have dismissed Dr. Hakki's claims instead of entering judgment on them. Accordingly, we affirm the decision of the district court, but we remand solely so that the district court can amend its judgment to reflect that it is a dismissal without prejudice for lack of jurisdiction. Kennedy, 998 F.3d at 1237.

---

[17] Dr. Hakki's makes additional arguments, including that it is undisputed that he has exhausted all avenues of relief, that he has no alternative avenue of relief for his arbitrary-and-capricious and due process arguments, and that the VBA does not expressly limit mandamus relief. For this last argument, he analogizes to the relief available in certain benefits cases, arguing that 42 U.S.C. § 405(h) has not been read to preclude mandamus relief and therefore neither should 38 U.S.C. § 7463. See In re Bayou Shores SNF, LLC, 828 F.3d 1297, 1313 (11th Cir. 2016) (declining to answer the question of whether § 405(h)—which refers only to the jurisdictional bases in 28 U.S.C. §§ 1331 and 1346 for judicial review—bars mandamus relief pursuant to § 1361, while recognizing that "the great weight of authority from other circuits has almost uniformly found that § 405(h) does not necessarily deprive district courts of mandamus jurisdiction over Medicare claims"). Dr. Hakki's arguments in this regard pose the question of whether § 7463, which precludes judicial review of VA disciplinary decisions made pursuant thereto, also precludes district courts from issuing mandamus relief. Stated in terms of the adequacy of alternative remedies, the question is whether the procedures pursuant to § 7463 are "adequate" for the purposes of mandamus jurisdiction, despite their preclusion of judicial review. We have held that the CSRA, as a comprehensive statutory scheme providing for limited judicial review in the circumstances required by the statute, is an adequate remedy such that mandamus jurisdiction is unavailable. Stephens, 901 F.2d at 1576. We need not answer the question of whether § 7463, too, always bars mandamus relief or is an adequate alternative remedy such that mandamus cannot lie simply on that basis because we hold Dr. Hakki has established neither a clear right to relief owed to him nor a clear duty to act owed by the VA, and thus there is no mandamus jurisdiction.

AFFIRMED AND REMANDED.

JORDAN, Circuit Judge, concurring.

I join Judge Anderson's comprehensive opinion for the Court except as to Part III.B.2.a, which addresses Dr. Hakki's first procedural due process claim, and the portion of the conclusion related to Part III.B.2.a. As to Part III.B.2.a, I would reject that procedural due process claim on the merits rather than dismiss it for lack of subject-matter jurisdiction.

A "nonfrivolous allegation of jurisdiction generally suffices to establish jurisdiction upon initiation of a case." *Perry v. Merit Systems Protection Bd.*, 137 S. Ct. 1975, 1984 (2017). As the Supreme Court told us long ago, "[j]urisdiction . . . is not defeated . . . by the possibility that the averments might fail to state a cause of action on which [a plaintiff] cold actually recover." *Bell v. Hood*, 327 U.S. 678, 682 (1946). A "suit may sometimes be dismissed for want of jurisdiction where the alleged claim under the Constitution or federal statutes clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous." *Id.* at 682–83. But the standard for such a dismissal is a rigorous one: "Constitutional insubstantiality . . . has been equated with such concepts as 'essentially fictitious,' 'wholly insubstantial,' 'obviously frivolous,' and 'obviously without merit.' And the adverbs [are] no mere throwaways; [t]he limiting words 'wholly' and 'obviously' have cogent legal

53

significance." *Shapiro v. McManus*, 577 U.S. 39, 45–46 (2015) (internal citations and quotation marks omitted).

The line between a frivolous constitutional claim and a weak constitutional claim is, admittedly, sometimes difficult to draw. And the Court's opinion lays out a reasonable theory as to why Dr. Hakki's first procedural due process claim is so insubstantial as to not confer subject-matter jurisdiction. Nevertheless, I do not believe we should dismiss that claim on jurisdictional grounds.

The claim is not legally frivolous, as we have not addressed whether an equitable constitutional claim is available to federal employees like Dr. Hakki. And though a detailed examination of the record demonstrates that Dr. Hakki was not denied procedural due process, his claim is not in my view "obviously frivolous" or "essentially fictitious" or "wholly insubstantial" for purposes of subject-matter jurisdiction. *See Williamson v. Tucker*, 645 F.2d 404, 415 (5th Cir. 1981) ("Judicial economy is best promoted when the existence of a federal right is directly reached and, where no claim is found to exist, the case is dismissed on the merits.").

In sum, I agree that the claim fails for the reasons given by the Court, but conclude that it fails on the merits. I would assume without deciding that an employee like Dr. Hakki can assert an equitable constitutional claim, and hold that he has failed to make out any procedural due process claim. *Cf. Herrera v. Collins*, 506 U.S. 390, 417 (1993) (assuming, without deciding, that "in a capital case a truly

54

persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional," but holding that the showing made by the defendant on actual innocence was insufficient).